## W. L. HARVEY v. THE STATE.

### No. 796. Decided March 11th, 1896.

**1. Continuance—Diligence.**

Where an application for continuance recited that the absent witnesses were present at former terms of the court. Held: It was insufficient, in not showing that they were present at the term then being held, on the day the criminal docket was taken up, or at least on the day when the case against the defendant was set down for trial. If they were not present at either of the terms mentioned, legal diligence imposed upon the defendant, at such time, to have sued out an attachment for said witnesses.

**2. Same—Second Application—Cumulative Testimony.**

A second application for continuance will not be granted for testimony which would only be cumulative.

**3. Same—Removal of Witness From the State.**

Where an application for continuance states that defendant only heard of the re moval of the witness from the State, on the day before the trial. Held: It should have shown that some diligence was previously used during the term to ascertain the whereabouts of the witness; and if he had removed, some effort should have been made to procure his deposition.

**4. Same—New Trial.**

Where the record shows that defendant had used the testimony given by the witnesses on a former trial of the case, an application for continuance, and the motion for new trial based thereon, will be held to have been properly overruled.

**5. Murder—Evidence—Declarations of Witness to a Third Party.**

On a trial for murder, while it is competent to prove by a witness that, as he was working in the field, he heard shots in the direction of and at the time deceased was alleged to have been killed, it is not admissible to prove that the witness told a third party that he had heard shots fired in that direction, and that he insisted on going in that direction, because he had heard the shots in that direction.

**6. Same—Flight of Defendant.**

On a trial for murder, where there was no effort on the part of the prosecution to show that defendant fled; and his own evidence has shown a voluntary surrender, it is not error to refuse to permit him to prove that at the time of his arrest he made no effort to run away.

**7. Witness—Re-direct Examination—Leading Question.**

On a trial for murder, where a witness for defendant, on cross-examination, had fixed the date of the killing on the 10th of May. Held: That on re-direct examination by defendant, while it would be permissible to show that she was mistaken as to the date, it was not proper to propound the question: "Then, if the killing occurred on the 18th day of May, 1893, you were mistaken about it being May 10th, 1892?" The question was clearly leading, as it informed the witness that the killing did take place on the 18th of May, 1893.

**8. Evidence—Proof of Questions Asked Defendant Which Explained His Statements.**

On a trial for murder, where the defendant's statements are sought to be introduced in evidence against him, it is competent to prove by a witness, who heard the statements, the question which elicited the statements, and especially so where the statements or answers would be hardly intelligible without the question.

**9. Murder of the Second Degree—Where Charge Defines Express Malice.**

On a trial for murder in the second degree, after a former trial, which acquitted defendant of murder in the first degree, it was not error, but was proper practice for the charge to define express malice, if it distinctly stated that this definition was given in order that a proper charge on implied malice might be presented.

35th Crim. Rep.—35.

**10.   Same—Where the Evidence Shows a Killing Upon Express Malice.**

On a trial for murder, where the defendant has been previously tried and acquitted of murder in the first degree, he is not entitled to an acquittal altogether if the evidence establishes a killing upon express malice.   Following, Fuller v. State, 30 Tex. Crim. App., 559; Conde v. State, ante p. 98.

**.11.   Charge—Refusal of Special Instructions.**

Where the charge of the court properly and correctly covers the issues raised by the evidence, it is not error to refuse special requested instructions upon such issues.

**12.   Sending a Former Verdict Out With the Jury—New Trial.**

At a former trial, appellant was convicted of murder in the second degree, and the verdict so finding, with the assessment of the punishment, was endorsed upon the indictment, and when the jury in this case were about to retire, the court's attention was called to that fact, and he informed counsel that the indictment would not be sent out.   The clerk, however, spread ink over the face of the indictment to obliterate the verdict, and the judge certifies that it not appearing to be legible, he sent it out with the papers to the jury—the defendant and his counsel being ignorant of the matter until the return of the verdict in this case, when it was presented as one of the grounds in defendant's motion for new trial.   Held: Upon the facts stated in the opinion, and in the absence of some showing of injury to appellant, not to be fundamental error, or such error as would have authorized the court below to grant a new trial.

**13.   Improper Argument of Counsel—Practice.**

·   Improper argument of counsel, to be available, must have been objected to at the time, a bill of exceptions reserved, and the court asked to instruct the jury with regard thereto.   It cannot be availed of for the first time on a motion for new trial.

APPEAL from the District Court of Hunt.   Tried below before Hon. E. W. TERHUNE.

This appeal is from a conviction for murder in the second degree, the punishment assessed being ten years' imprisonment in the penitentiary.

The following is the evidence, as shown by the statement of facts:   By John Morris it showed that at the time of the killing he lived about 400 yards from the defendant, and about the same distance from the deceased.   On the morning of the killing, one F. M. Terrell called to him and told him that appellant had killed deceased.   He and Terrell and Terrell's son, started to the place where the killing was said to have occurred.   Deceased and appellant lived on adjoining farms, except there was a narrow lane between them, which had not been opened out.   Witness went down this lane to where the same opened into the Greenville and Wolfe City road, and there sent the son of Terrell to notify Mr. Gann and others of what had happened, and then started back, going over inside of deceased's field.   At this time, appellant, who had come down, called and asked if they had found the body, and they said "no."   Then the appellant said, "There he lies," and pointed to where the body was. It was in some corn, which was small.   They went to the body and found it lying across the row that he had been hoeing, the ground showing that he had been hoeing and walking west.   The body was lying on the handle of the hoe, and the blade of the hoe was lying about the middle of the row north of the one he had been hoeing.   The hoe showed it had been freshly cleaned. The body was lying mostly on his back with his face a little to the east. His hat was lying on his breast like, with his pistol lying about six feet a

little east of north of the body. Terrell first called attention to the pistol. William Gann, Buck Cargle and Jimmie Terrell, who had gone after them, came there soon after witness, and were the first persons there after him. Appellant was standing near the body when Gann came, and Gann said, "Oh, Lou, you had better have drug him away from his hoe and his row." Appellant replied, "I did not shoot him here; I shot him at the fence and he ran back here." Gann then said, "He took a heap of pains to run back here and fall on his hoe and his row." There were no tracks between the body and the pistol. The ground was wet, it having rained recently. Soon after Gann came, the officers came. This witness, on cross-examination, admitted that he had testified at two former trials, and did not remember that he had testified anything about where deceased's hat was lying when he got there. Did not remember having been asked about it, and admitted that the first time he testified was a few weeks after the killing, and his memory was better then about the circumstances of the case than it was at this trial, but said that if he had testified that the hat was lying two feet east of the body on the former trials, that he was mistaken about it, and affirmed that he was not now mistaken about the hat lying on the breast of the body. He also testified that George Scott and Mr. Hampton came there, and witness went away with them, and when he came back, the hat was lying on the ground, and said that he did not remember telling any one about the hat lying on the breast of the body until last court, but that he then told it to Mr. Looney. Witness admitted that he did not like appellant, and never had since the killing. Also testified that the shoulders of deceased were lying across the upper end of the hoe handle, and that he saw some bushes cut in the lane between the farm of deceased and appellant for a distance of probably 200 or 300 yards. That he saw the handle of an axe standing up as if the blade of the axe was sticking in the ground in the lane. On re-direct examination, he said that the tracks showed that where deceased fell, his toes twisted around a little from the west towards the north. This testimony was corroborated by W. B. Gann, and by B. H. Cargle, except that they said the hat was lying on the ground.

The State also proved by Dr. F. A. Ramsey that he examined the body of deceased on the day of the killing, and found a gun-shot wound located in the right side, about an inch and a quarter below and a little to the right of the right nipple, and that the ball ranged backwards to the left, passing through the spinal column, and lodging on the left side of it, and right under the skin, where he got it out.

The State also proved by F. M. Terrell that he lived about three-quarters of a mile from deceased, and about one-quarter of a mile from appellant. That on the morning of the killing, appellant came to where witness was plowing in the field, and told witness he had done the worst thing a man could do. He said he had shot or killed Dick Yeager, which of the two witness could not remember. Said he had to do it to defend himself, that Yeager was advancing on him with a pistol,

and asked witness to go there and see where the pistol was, and not let anybody move it.   Witness and his son, Jimmie, and John Morris went over and found the body as stated in Morris' testimony, and saw, about four to six feet from the feet of the body, the pistol lying on the ground cocked.   This witness testifies that he heard what the witness Gann said to the appellant, but did not hear any reply.   Also said there were no tracks between the body and the pistol.   On cross-examination, witness said that appellant told him that after he shot deceased, he went up in the field to give him a drink of water or see what he could do for him, and if he could help him.   That the witness got to the body with and at the same time Morris did, and when they first got there, the hat of deceased was lying on the ground about a head's length from the head of the body; he supposed about six inches from the head; and that there came a puff of wind and blew it over on his face.   His description of how the body was lying, and the position of the hoe is the same as that of Morris.   On re-direct examination, witness stated that when appellant first came to witness in the field, he told him about going up in the field near the body of deceased after the shooting, and that witness saw in the field, tracks that came up to about where the pistol was, coming from the lane fence.   This witness claimed to be a good friend of both defendant and deceased.

The Justice of the Peace, L. N. Cole, who held the inquest, testified that when he went to the body, he saw a pistol lying about four or six feet from it, and saw the tracks coming up from the lane north of the body, passing sort of up between the pistol and the body, and then the same track went back to the lane.   He saw some tracks in the lane, some near a black stump about the fence, rather on the north side of the lane, west of north of the body, about thirty yards, and saw where it appeared that some one had gone diagonally across the lane.   The lane was about forty or fifty yards from the body, and the same could be seen from the body.   His description of the position of the body and the hoe were the same as given by other witnesses.   On cross-examination, witness testified that W. S. Archibald was Constable of Precinct No. 5, where the killing occurred, at the time of the killing, and went with witness to the body, and was the first party who picked up the pistol.   That he saw where the muzzle of the pistol had stuck in the ground and filled up with mud.   That the pistol was loaded, and that Mrs. Yeager, the wife of deceased, identified the pistol on a former trial of this case in this court as the pistol of deceased.   Said it looked like the pistol would have made more impression if it had been thrown down.

Dan Kelly, witness for the State, testified that he lived on the place of William Gann at the time of the killing.   That he had worked two days for appellant that week before the killing, and that on one of those days he went to the house of deceased after dinner at noon.   That before he went, appellant told him that Mrs. Yeager was not at home, but he found deceased there, and got some turnips, which he had gone after, and brought them back with him to appellant's, and carried them home

that night.    On cross-examination, witness stated that while he was at deceased's house getting the turnips, deceased asked him if appellant was going to let the lane run through by his house.    Witness told him he did not know.    Deceased said he would rather die and go to hell than let it run through any other way than according to the old contract.    On re-direct examination, witness said he told appellant about what deceased said, when he returned to appellant's house.    The appellant said he would have to let it run through south.    In going home witness saw deceased, and told him what appellant said, and that it was then that deceased said he would rather die and go to hell than have it run any other way than according to the old contract.

This statement embraces the evidence introduced by the State in opening their case, and is substantially all the criminative facts introduced.

In explanation of these criminative facts, defendant proved by Mrs. L. W. Yeager that she was the wife of deceased, and that deceased owned a pistol at the time of his death.    That she kept the pistol between the mattresses at the foot of the bed.    That deceased did not know where she kept it, until once when she was away from home, and he looked for it and found it, and told her about it when she returned. That it was a small, five-barrelled pistol.    She then testified about having been interrogated about it heretofore, and said the pistol was not under the beds when she went to use them after the killing.    She also testified that once when the brother of deceased was moving, he brought a double-barreled shotgun to deceased's house, and that it stayed there over night.    That in the afternoon deceased came from the field where he was at work, got the gun, took it to the field, and at night when he returned, he left it at the lot until after supper or the next morning, she did not remember which.    Never told her what he was going to do with the gun.

By G. B. Scott, defendant proved that on the day of the killing he lived near deceased and appellant.    That he was well acquainted with deceased, but not very well acquainted with appellant.    On that day he was working in William Knull's field for J. P. Hampton.    That about 9 or 10 o'clock he heard a shot fired south of him, and that just before he heard the shot fired, he heard some one talking rather loud and harshly. That they seemed to be quarreling, and it appeared to be two men talking, but he could not understand what they said.    That directly after he heard the talking he heard a gun fire.    That the talking and the firing were in the same direction, and appeared to be about the same distance; he could not tell how far they were, but supposed that they were over in deceased's field.    That the ground was high where he was, and just south of him it was lower, and there was a little brush, and that the ground over beyond where he afterwards saw deceased's body, was higher again.    That soon after he heard the shot, Mr. William Knull came to where he was at work, and told him that appellant had killed deceased, and asked him to go over there.    Knull wanted to go

around the road, but witness wanted to go straight through the field, because he thought if anything had happened over there it would have occurred where he heard the talking. That they went in the direction he heard the talking, and came to the body of deceased over in his field. That when they got there, they found Gann and Cargle, Morris and Terrell there. On cross-examination he said that Knull told him that John Gann had told him, Knull, about the killing. That he did not know how long it was after he heard the talking before he heard the gun fire. Witness was then asked, "After you heard the quarreling, wasn't it ten or fifteen minutes before you heard the gun shot?" and answered, "I would not say how long." Q.—"It was something like that?" A.— "It was after I heard the talking. It might have been ten, or it might have been fifteen minutes, I do not know how long." He said the talking did not continue until the shooting. That he heard several guns fire around there that morning. Didn't know how many, but that the wind was blowing from the south. On re-direct examination witness, said that at the time he heard the shot, Mattie Chester was working in the same field, about thirty yards south of him.

Then appellant proved by A. S. Swindle, J. B. Slater and J. B. Latham, that last December they had pointed out to them the place where Mattie Chester was working when the killing was done, and the place where the body of deceased was found, and that they tested the question as to whether she could have heard the quarreling or not, by having one man stand where the body lay, another in the lane where appellant stood, and talk to each other, while a third man stood over at the place where she was at work. That ordinary loud talking could be heard without any difficulty by the man standing where she was at work at the time of the killing.

Then proved by A. C. Houston, that the Sunday after the killing he was in the lane where appellant stood at the time of the killing, and saw where brush had been cut about 150 yards up and down the lane, and the leaves showed it had been cut recently. The same facts were proven by Lige Baker. The same was proven by J. C. Glenn. As well as by other witnesses.

By Dora Andrews, that he made a trade with appellant, by which appellant gave him a half interest in the cross fence between them and $2 in money for a strip of land eight feet wide off the south edge of his land next to deceased's land, leading from appellant's land to the public road, and appellant was to build a fence along the lane. At the time of making the trade, appellant told witness that deceased had left eight feet wide for a lane along there, which would have made a sixteen foot lane from the southeast corner of appellant's land to the public road. That this trade was made in the spring before deceased was killed.

By C. C. Stovall, that he saw deceased the Monday before he was. killed and walked out in his field, and on the land of Dora Andrews, and talked with deceased. Witness was talking about trading for the Andrews land. Deceased told witness that he had agreed with appellant.

to give eight feet along the north side of his land for a lane out to the public road, provided defendant would open it up out to the east. Witness asked deceased if appellant was not a pretty good sort of a fellow. Deceased replied, "You may call him a good sort of fellow, but he has never done anything right with me." Deceased then went on to say that he had sold appellant some land that was in a loan company, and that the deed was to be made a certain way, and appellant claimed that it was to be made a certain other way. One day appellant and John Girard came to where he, deceased, was plowing in the field, and appellant told him the deed was to be made a certain way, and he could prove it by John Girard. That the deceased told appellant that if he said so, it was an infernal lie, and took his hatchet and ran appellant and John Girard out of the field. Witness told deceased he had not heard of this difficulty. Deceased replied, "We have been on the war-path for about two years," and then said that appellant had slipped on him behind a tree, and that he went to the house and got his gun, and came back and told him to get out from behind there, or he would kill him, and that appellant took a tree on him and kept it until he got out of sight. By this witness appellant also proved that he was a peaceable and law-abiding citizen, and that that was his reputation in the community where he lived. On cross-examination, witness testified that deceased said he and appellant had agreed to have no more trouble about their land matter, but that if he was to live there forty years, he would never have anything more to do with appellant.

By Colwell Hefner, "That about a week before the killing, he was trying to trade a cart to deceased for his pistol, and was over at the house of deceased, who brought the pistol out, and deceased shot it some. In shooting the pistol he used both hands. That they were shooting at a plank about twenty steps off."

By J. H. Myrick, appellant proved that at the time of the killing of deceased, he was city marshal at Wolfe City, and went with the justice of the peace to where the killing was done. That he saw the pistol where it was lying. That it was black land with a good deal of the soil washed off. That it was thin and gravelly and the ground was harder where the body lay than at any other point. That he arrested appellant, and that when he told him that he would have to arrest him, that appellant asked him if he would have to go to Wolfe City. Witness answered, yes. That appellant then talked to witness about how the killing was done. That appellant said that he was coming up the lane, and deceased called to him and said it would be a good time to settle that lane matter. That they then talked awhile, and deceased drew his pistol. That when he did so, the appellant put up his gun, and deceased took down his pistol, and then appellant his gun. That they then talked awhile longer, when deceased again put up his pistol as if to shoot, whereupon appellant shot him. That after the shooting he went up in the field to see if he could help deceased.

That the pistol by deceased's body was a 32 or 38-caliber, he did not

know which. That at the time he saw it, W. S. Archibald, constable of that precinct, had it. On re-direct examination, witness said that appellant told him in the conversation above refered to that deceased was standing in his field and he in the lane at the time of the shooting. That he saw some wire staples and a hatchet at the gate at the east end of the lane that morning, and the gate looked like it had recently been worked on. Witness also stated that W. S. Archibald had recently moved permanently to the State of Missouri, and that he told appellant's counsel the morning this case was reached that Archibald was gone to Missouri, but did not know he had moved.

By H. Defee, that about 8 or 9 o'clock in the morning on the day deceased was killed, he saw deceased going into his horse lot from the direction of his house, and going in the direction of his field, which lay east and north of his house. Witness was traveling west in a wagon, and went on about 300 or 400 yards, when he heard a gun fire back in the direction of where deceased lived. On cross-examination witness said that after he passed the house of deceased he met some men in a buggy, one of whom is named Laroe, who is a witness in attendance upon court.

By E. L. Adams, that he was at the house of appellant two days before the killing; was there with Mr. Glenn. That he and Glenn were out squirrel hunting, and went to appellant's to get his dog. Saw Dan Kelly there, and heard him ask appellant if he could go to Yeager's and get some turnips. Appellant told him yes, if he was back by 1 o'clock, and told Kelly when he returned to go to work in a certain piece of corn, and appellant never said anything about Mrs. Yeager's not being at home.

By John Cherry, that he was with the witness, Myrick, when he arrested appellant, and heard his statement about how the killing was done. That he said he went down in the lane to cut some brush, and that his wife was sick, and he took his gun along, thinking he might see a bird or squirrel and kill it for her to eat. He either said he heard deceased, or deceased called to him, and said, wouldn't it be a good time to settle that difficulty. Stated the details about the same as Myrick, and then said that after the shooting, appellant said he heard Yeager say something, and he was sorry for what he had done, and his impulse was to go up to deceased and see if he could help him any way. That appellant said he was standing in the lane at the time the shooting was done, and was north of deceased. On cross-examination, witness said that appellant said he was fixing a gate and cutting brush that morning, and he, witness, saw a hatchet, wire, etc., at the gate.

By Dr. Eugene Williams, that he was a physician, and lived at Wolfe City, and a few days before deceased was killed, he visited the wife of appellant. She was quite sick and weak, her child being four or five days old. That about four or five days before the killing, he was there, and directed that she be furnished soups to eat, and told appellant that it was a wet spell, and he could not work in his crop and he might take

his gun and go out and kill a bird or squirrel, and probably she could eat it. That a day or two before the killing, appellant saw witness and got some medicine for his wife.

By Mrs. W. L. Harvey, that she was the wife of appellant. That the morning deceased was killed, she told appellant she did not feel like eating anything, and wished he would see if he could get her a squirrel or bird to eat. He said he was going to fix a gate and cut some brush in the lane and would take his gun with him, and see if he could not kill a bird or squirrel. When he left the house he took his axe and his gun with him. That he frequently carried his gun with him about the place in wet weather to kill birds and squirrels with, and brought them home and they ate them. That north of the lane in which he was going to work there were some woods. That deceased's field was south of the lane. That witness had frequently seen birds around there; that appellant had killed squirrels in those woods north of the lane. That Mrs. Paulina Harvey, mother of appellant, was at their house that morning. That she is sick at home in this county, and is over 50 years old.

By Mattie Chester, that she is an orphan, and at the time deceased was killed, was living with her uncle, William Knull, something less than a mile from the place of deceased. That on the day of the killing she was hoeing corn in her uncle's field, the same field in which Geo. B. Scott was plowing. That she was south of Scott. That she heard loud, angry talking, and then heard a gun fire, and the talking ceased. This was in the morning, the exact time of day she could not tell, but afterwards her aunt called her, and she went to the house and looked at the clock, and it lacked five minutes to eleven o'clock. That she does not know who it was talking, but that it was due south from where she was. The deceased's house was southwest of her. That after the first trial of this case, she heard her uncle talking about it, and told him what she had heard, and he told her not to tell anything about it, that he would whip her if she did. He did not want her bothered about going to court. That she was then 14 years old.

By Will V. King, that he was a stenographer, and took the testimony in this case the first time the cause was tried, and still had the original note book in which he took the testimony. That his notes were correct, and that he took the testimony of John Morris. That Morris was asked this question, "Did you see his hat?" A.—"Yes, sir." Q.—"What kind of a hat was it, and where was it?" A.—"It was a brown hat, and was lying on the ground." Q.—"How far from him, and what direction?" A.—"East of him, just a little, I guess. It was not more than a foot and a half from him."

On cross-examination, witness said that the questions and answers read to the jury did not show whether Morris was testifying about when he first got to the body or not, or whether it was after he went away from the body and returned. That he had not read all the notes. Witness was requested to read his notes, and was then recalled, and said that the testimony as taken did not show whether this was when Morris

first got to the body or not, but that just before the questions above stated were asked witness, he was describing the position of the body, etc.

By Miss Katherine Ward, that she was a stenographer, and took the testimony in this cause on the last trial. That John Morris, a witness. for the State, testified on that trial. That she took his testimony, and had the original notes of his testimony. They were correct. That they showed the following questions were asked the witness, and the following answers given: Q.—"How near were you to the elm tree when you turned to go to Yeager's body?" A.—"Well, somewhere about sixty yards, somewhere, I guess." Q.—"Did you go straight towards the body?" A.—"No, sir, we went around a little east." Q.—"When you got up close to it?" A.—"Yes, sir, when we got up there." Q.—"Came up to the body from the east side?" A.—"Yes, sir." Q.—"How far did you pass east of the body?" A.—"Well, I never noticed close; I guess we went east of the body may be something like six or eight steps." Q.—"Which one of you went near to the body?" A.—"Mr. Terrell." Q.—"Where was Mr. Yeager's hat?" A.—"As well as I remember, it was lying on the ground to the right of him, to the east of him." Q.—"How far from his head?" A.—I could not be positive; I expect off something like two feet, may be."

By E. L. Shine, that he was a member of the jury on the first trial of this cause, and that the witness, John Morris, did not swear on that trial that Yeager's hat was lying on his breast when he first got there.

Appellant was then placed on the stand as a witness in his own behalf, and testified that he had known deceased about four years before his death. That at one time he had a few words with deceased, pertaining to a fuss between a young man by the name of John Girard and deceased. That soon after he got acquainted with deceased, he bought two acres of land from him, and paid him $30 for them. That this was in the winter time. That afterwards he bought the balance of a 24-acre tract. All the land had a mortgage on it. That he tried several times. to get a deed, and John Girard came to his house to go to work for him to clear the land. The day before this, he had seen deceased, and he had promised to make the deed. When Girard came, appellant went with him to deceased, and asked if the deed had been made. Deceased said, no, and then said that he had heard that John Girard had said that he, deceased, would get next to Harvey by giving him an outlet on the east, and that if Girard had said this, that he was a liar. That Girard got up and told him, deceased, that if he called him a liar, he would fight him. That deceased reached back and got his hatchet off his plow and came after Girard, and appellant got between them and stopped the fuss. Deceased put the hatchet back, and said, "You stay here, boys, and I will get my gun to you." They left and went back to appellant's house, and deceased came back with a double-barreled shotgun and came down in appellant's lot. Appellant sent John Girard out, and they had some talk that appellant could not hear, but Girard came back and told appellant not to have any trouble with deceased and deceased then went

back to his plowing. Afterwards, appellant saw deceased, and had a talk with him, and they patched the matter up.

That when Dan Kelly was working for appellant, he asked at noon if he could go to deceased's and get some turnips. Appellant gave him permission, and told him what to do when he came back. In the afternoon Kelly told appellant that deceased said he would rather die and go to hell, rather than have the lane opened the way it was to be. That on the morning of the killing, he fixed a gate at the mouth of the lane next to his house, and left a hatchet and wire lying there. That appellant had not known of Yeager's objecting to the lane being closed at the east end until Kelly told him about it. That when appellant left the house on the morning of the killing to fix the gate, he also started to cut some brush in the lane. That his wife was sick, and asked him to take his gun, and see if he could not kill a bird or a squirrel, which he frequently did when she was sick, and the doctor had also advised him to do so. He took his gun along, and when he got through fixing the gate, he went down in the lane and commenced cutting brush, and he does not remember how he moved the gun, but supposed he set it down while he worked, and would then carry it forward. He frequently killed birds and squirrels with that rifle, and there were birds in the lane at times. That as far as he worked down the lane, he cut the brush that would be in the way of a wagon. That before he got to the big road, he quit, and started to the house, and was walking up the lane, and had not yet reached the woods which he intended to go through, when he got even with deceased, who was working, hoeing corn, about forty yards south of the lane. That he had seen deceased during the morning, and a short time before starting for the house, had seen deceased go to his house and return. That when he got opposite deceased, deceased called to him, and said, "We will settle that lane racket." Appellant asked, what lane racket, or something like that. Deceased drew his pistol. Appellant dropped his axe and threw his gun up. Deceased then let his pistol down, and appellant his gun. Appellant started on down the lane, and said, "I am going to put the lane right where I was to." Deceased said, "You are a damned liar," and dropped his hoe and stepped around a step or two towards appellant, raised his pistol in front of him, having both hands in front of him. As he did this, appellant threw up his gun and fired. Deceased was turning in the direction of appellant when the gun fired. Appellant saw the pistol drop from his hands, and he fell rather backwards, still turning a little. Appellant says he thought deceased was going to shoot him at the time he fired. After shooting, appellant went up through the field towards the body. Did not know how close he got, nor why he went, except through excitement. Thinks he asked if he was bad hurt, and deceased made no reply. That he saw the pistol lying on the ground. Never touched the pistol nor deceased's hat. Then he went over to Mr. Terrell's field and told him what he had done. He testifies that when William Gann came to the body and said what he did to appellant, that he, appellant, made no reply, but went down in

the lane, and when he got to the point where he was standing when he shot, he told Gann that there was where he stood when he shot. That Gann and Cargle were not friendly to him.

Appellant then reproduced the testimony of William Knull, by which he proved that on the day of the killing John Gann told Knull about the killing. Knull then went to where Scott was at work and told him about it. That Scott wanted to go through the field, and they went that way, and found deceased's body. He describes the position of the body and hoe as other witnesses, and says the pistol was six or seven feet north of the feet of the body, and there were some impressions between the feet and the pistol that looked like footprints, such as the witness had made in going across the field. There were several of these, and they went straight from the feet to the pistol. Also testified that deceased had talked to him about appellant, and said appellant was a rascal and a liar, and that the deceased had once run him off his land with a shotgun.

Also reproduced the testimony of W. P. Hampton. He testified as to going to the body and seeing the pistol lying on the ground, and that the pistol was cocked, and that there were as many as three tracks between the feet of the body and the pistol. Did not know how many exactly, but the toes were pointing towards the pistol.

In rebuttal, the State offered portions of the voluntary statement made by defendant on the examining trial, in which appellant stated that deceased said, "Get yourself out there in open position, and we will settle this thing." Deceased drew his pistol and made a step or two towards appellant, who said "Dick, don't come towards me with that pistol."

Appellant was then recalled by the State, and asked if he could see deceased from the gate where he was at work. On cross-examination, appellant testified that he had never been a witness before the examining trial in this cause. That a young lawyer named Tidwell represented him, and that Mr. Ed. H. Bennett represented the State. That Bennett was a very able and experienced lawyer, and there was no comparison between him and Tidwell. That when the testimony was written down they told him to sign it, and he did so. If it was ever read over to him, he did not recall it. The State then proved by the Justice of the Peace that the testimony was read over to appellant.

The State then corroborated Gann and Cargle by J. J. Terrell, as to reply appellant made to Gann, who testified that he had never told anybody about it before except Mr. Looney.

William Gann was put on by the State, who testified as before stated. On cross-examination, said that he had talked with deceased about the difficulty between him and appellant, several times. That deceased and appellant were in an uproar for some time, and that witness begged them for peace, and that he had helped work up the testimony against appellant.

B. H. Cargle testified as before stated, and on cross-examination testified that he believed in a God, and had ever since the war. Also that

about two months before the killing he heard deceased say that some-
times he had a notion to take his pistol and kill appellant, but said that
he would not do that, but that if appellant bothered him any more, he
would give him a good cursing. If appellant took it, it was all right;
if he didn't, it was all right, and that then he meant to use weapons on
appellant. Deceased told this witness also about getting his gun and
running appellant out of the field.

*Perkins, Gilbert & Perkins* and *M. M. Brooks*, for appellant.—1. It
was error to overrule defendant's application for continuance. Frazier
v. State, 22 Tex. Crim. App., 120; Miller v. State, 18 Tex. Crim. App.,
232; Jackson v. State, 23 Tex. Crim. App., 183.

2. The court erred in permitting the witness, George B. Scott, to
testify that he told William Knull, that he heard the quarreling and the
gun fire, in the direction where the killing occurred. Where a witness
testified to a fact that is controverted he may corroborate the same by
testifying to "verbal acts," made by him at the time or soon after the
occurrence. Art. 751, Penal Code; Davis' case, 3 Tex. Crim. App., 91;
Rainey's case, 20 Tex. Crim. App., 470; Russell's case, 11 Tex. Crim.
App., 288; 1 Green, Sec. 108 and note on p. 130, also see, Stockman's
case, 24 Tex. Crim. App., 392.

3. The court erred in refusing to permit John Cherry to answer the
question, "Did defendant make any effort to run away," the answer ex-
pected being that he did not. Where a defendant testified to facts that
justify a killing it is always admissible to prove that he thought he was
justifiable by circumstances, and not attempting to flee, is strong evi-
dence of this fact.

4. The court erred in refusing to permit Mattie Chester to answer
the question, "Then, if the killing occurred on the 18th day of May,
1893, you were mistaken about it being May 10th, 1892?" It is admis-
sible to call a witness' attention directly to a mistake. This witness
was a young girl, who was 14 years of age at the time of the killing, and
about 17 at the time of the trial. She testified where she was at work
the day of the killing, how she learned about it, and the circumstances
surrounding it, but on cross-examination said that the killing occurred
on May 10th, 1892. The question would have explained this testimony.
McWilliams' case, 44 Texas, 117; Marshall's case, 5 Tex. Crim. App.,
273; Pharr's case, 9 Tex. Crim. App., 129.

5. The court erred in permitting Hon. C. H. Yoakum, special coun-
sel for the State, in closing the case, to say to the jury that he requested
them to find the defendant guilty, and if they did so, it would be ap-
proved by the people and affirmed by the Court of Appeals of the State
of Texas. This language was used, and appellant tendered a bill of
exceptions thereto, which bill the court approved, with the qualification
that his attention was not called to the same until after the jury returned
with their verdict and were discharged, and was raised first in motion
for a new trial. We submit that it is not incumbent upon a defendant,

or his counsel, in order to reserve their right in this regard, to be continually objecting to the closing argument. This always makes a bad impression upon the jury, so far as a defendant is concerned. It is the duty of the court to see that such argument is confined to the record, and is legitimate. Butler's case, 27 S. W. Rep., 128; Weatherford's case, 21 S. W. Rep., 251, and Henry's case, 30 S. W. Rep., 802.

6. The court erred in permitting the jury in their retirement to take with them the original indictment, with the former verdict of conviction written thereon, in such manner that it could be read. A former conviction should not be referred to or proven on a subsequent trial. The court instructed the clerk to erase the verdict of former conviction from the indictment. The clerk attempted to do so by inking the same, but the verdict could still be read. (See same on original indictment, sent up by order of the court with the transcript). This sending out of the indictment was unknown to appellant at the time it was done, and the court had informed appellant's counsel that it would not be sent out. This question was raised and presented and objection made on the hearing of the motion for a new trial. Art., Penal Code, 783; Hatch's case, 8 Tex. Crim. App., 417; House's case, 9 Tex. Crim. App., 567, and 17 S. W. Rep., 1108.

*Mann Trice*, Assistant Attorney-General, for the State.

HENDERSON, JUDGE.—Appellant was tried and convicted of murder in the second degree, and his punishment assessed at ten years in the penitentiary, and he prosecutes this appeal. The appellant assigns a number of errors, but we will only consider such as we deem important. The court overruled the motion for a continuance presented by appellant, the ground for which was the absence of the following witnesses: Mrs. Paulina Harvey, Coon Williams, W. S. Archibald, Hampden, Swindle and Knull. As to the witnesses, Mrs. Harvey, Coon Williams and W. S. Archibald, the diligence was the same. The application recites that they were present at the former terms of the court, but nowhere does the application state that either of the said witnesses was present at the term of the trial. The indictment in this case was presented at the June term, 1893, and this trial did not take place until the June term, 1895. The June term in 1895 began on the second Monday of June, and this trial was had on the 15th day of July, 1895. The application should have shown that said witnesses were present at the term of the court on the day the criminal docket was taken up, or at least on the day when the case against the appellant was set down for trial. If they were not present at said time, it was the duty of the appellant then to have sued out an attachment for said witnesses. As to the witness, Mrs. Harvey, however, it is stated that she was sick at the time of the trial, otherwise she would have been present. Concede that the diligence as to her was sufficient, her evidence in regard to the condition of appellant's clothes on the day after the homicide, especially the knees of

his pants, was rendered immaterial, in view of the fact that the State introduced no evidence indicating that appellant had crawled on his knees in the lane on the day of the homicide to a place of concealment; nor did the State make any issue as to the purpose for which the defendant may have carried his gun on the day of the homicide. Two witnesses for the appellant testify that his purpose in carrying the gun on said day was to kill a squirrel or bird for the sick wife of appellant. This was corroborated by the advice given in that regard by the doctor. The State introduced no countervailing testimony. Besides, this was the second application for continuance, and the testimony of Mrs. Harvey would have been only cumulative. As to the testimony of Coon Williams, who, it was alleged in the application, would testify that he saw the lane from which appellant is alleged to have committed the homicide about three days thereafter, and that he would testify as to the bushes being cut down. This same testimony was had from several witnesses, and his evidence on this subject would have been only cumulative. The same observations hold good with regard to the testimony of Archibald concerning the lane. Besides, as to him, it is shown in the application that he was temporarily absent in the State of Missouri, and in the judge's explanation to the bill of exception it is shown that he had permanently removed to the State of Missouri. The application shows that appellant had only heard of his removal on the day before the trial. It is not shown, however, that he used any diligence to ascertain the fact of his removal. He should, at least, have shown some diligence during the term of the court to ascertain the whereabouts of this witness; and, if he had removed, some effort should have been made to procure his deposition. His testimony, however, at the former trial of the case, was accessible, but no effort was made by appellant to use the same. As to the other three witnesses, Hampden, Swindle and Knull, it is shown that they had removed permanently out of the State, and the appellant used their testimony delivered at a former trial of the case. The court did not err in overruling the application for a continuance, nor in refusing a new trial on that account.

Appellant proposed to show on the trial of the case by the witness, Scott, that he went with Knull to the place of the homicide, and proposed to show that when Knull came for him, and wanted to go around by the road, said witness, Scott, insisted on going straight through the field, because that was the direction in which he had heard the quarrel, and the firing of the gun. This, it seems to us, involves the admission of hearsay testimony; and we do not believe it was competent for the appellant to prove by the witness, Scott, that he told Knull at that time that he had heard shots fired in the particular direction in which the body was afterwards found, and that he insisted on going in that direction, because he had heard the shots fired in that direction. This witness, Scott, testified to the fact that he had heard shots from where he was working in the field in that particular direction at the time the deceased was alleged to have been killed. This was proof of the fact,

and was all that appellant was entitled to, except the further fact that they went to the scene of the homicide in that same direction, and this was admitted.   What Scott said at the time was properly excluded. Appellant also insisted on proving by the witness, John Cherry, that the appellant, at the time of his arrest, did not make any effort to run away.   The testimony on the part of the State fails to show flight on the part of the appellant after the alleged homicide.   No effort was made in that direction.   Appellant himself showed a voluntary surrender.   This was affirmative, and which he was entitled to show, and it negatives the contrary.   It appears that on the cross-examination of the appellant's witness, Mattie Chester, she testified that, according to her recollection, it was about the 10th of May, 1892, the killing occurred. Appellant insists that he had a right to ask the witness if the killing occurred on the 18th day of May, 1893; that she was mistaken about her location of the time as May 10, 1892.   While it was permissible for the appellant, on re-examination of the said witness, by proper questions to the witness to show that she was mistaken as to the date fixed by her in her cross-examination, yet we think that the question as it is presented in the record was clearly leading, as it informed the witness that the killing did take place on the 18th of May, 1893.   Unless, for some reason further than is apparent in the record, authorizing appellant to lead this witness, we think the action of the court was correct.

The State was permitted, over the objection of the appellant, to prove by the witness, J. J. Terrell, a conversation between William Gann and appellant.   The objection urged by appellant is, that said conversation involved hearsay evidence, in that William Gann asked appellant a question.   Of course, declarations of appellant in that connection were admissible, and his statement made would hardly be intelligible, without the question put to him by said Gann.   The question was by Gann to the appellant at the dead body of the deceased.   The question asked the witness was: "Did any one say anything to the defendant at the body of the deceased, and, if so, what?"   The answer was:   "Yes; Mr. Gann said, 'Lon, you ought to have dragged him away from his hoe, and the end of his row.'"   The answer of the defendant was: "That he did not shoot him there, but shot him up at the lane, and he ran back there, and fell on his hoe."   All of this testimony is to be regarded as original, and not hearsay evidence.   The witnesses, Gann or Terrell, or any other person who heard it, could testify in regard to it.   We have examined the charge of the court and the special charges asked and refused.   In regard to the contention of the appellant, that the court erred in defining express malice, the charge states distinctly that this definition was given in order that a proper charge on implied malice might be presented. This was the proper practice.   Nor did the court err in failing to instruct the jury, "if they found the defendant, as charged, committed the offense upon express malice, to acquit him of murder of the second degree, as also of manslaughter;" the position of the appellant being that, inasmuch as he had been before tried and acquitted of murder of the first

degree, if the evidence showed the killing was upon express malice, he should be acquitted altogether. The case of Fuller v. State, 30 Tex. Crim. App., 559, decides this proposition adversely to the appellant; and it is followed by a majority of the court in the Conde case, ante p. 98.

As stated before, we have examined the special charges asked, and in every particular, where such charges were required by the evidence, the propositions were covered, and properly so, in the charge of the court, so that these special charges were unnecessary. The appellant also assigns as error that the jury on their retirement were permitted by the court to take out with them the verdict of guilty and imprisonment for ten years, rendered at a former term on the trial of this defendant in this case. There is no separate bill to the action of the court in this regard, but the whole question was presented in a motion for a new trial, and on the overruling of the same a bill was reserved to the action of the court. The bill shows that the court's attention was called to the matter of a former verdict being on the indictment before the retirement of the jury, that he informed counsel that the indictment would not be sent out. The clerk, however, it appears, attempted to obliterate said verdict by spreading ink over the face of it, and so presented it to the judge. The judge certifies that it did not appear to him to be legible, and in such condition he sent it out with the papers to the jury, but that he did not inform appellant's counsel of his action in the premises, and the bill shows that they and appellant were ignorant of the matter until the return of the verdict by the jury. Appellant introduced several witnesses who testified that they could make out the verdict. The State also introduced several witnesses on the subject, who testified that they could not read the verdict in its then condition. The State also introduced Marchman, one of the jurors who tried the case, who swears that he could not make out the verdict, and that the matter was not called to his attention while they were considering of their verdict; and while in the jury room, in his presence and hearing, this matter was not alluded to or discussed. The original indictment, with the verdict thereon, is also before this court, having been sent up for inspection. Several cases have come before this court involving this question, where the verdict was plain and legible, but no exception was taken to the action of the court at the time in allowing the indictment with the verdict to be taken out by the jury, and this court refused to reverse the cases on such grounds. See, Cook v. State, 4 Tex. Crim. App., 265; Anschicks v. State, 6 Tex. Crim. App., 524. In the latter case the court says: "It was the business of counsel to see to it that the jury were permitted to carry with them such papers as were proper to be used in their retirement; and, if the attention of the court had been called to the subject, and it had refused to give the proper directions, it should have been presented by bill of exception." In this case, however, the bill shows that by no laches on the part of appellant or his counsel, the indictment, with the verdict thereon (in the shape as before stated), was permitted

to go to the jury, without appellant's knowledge, so that no opportunity was presented to save the bill when the verdict was carried out, and appellant embraced the earliest oppportunity within his power to present the matter to the court, to-wit: on motion for a new trial. It has been repeatedly held, however, that if acts or conduct of this character were essentially injurious to appellant's rights, such acts or conduct would constitute fundamental error, and in such case no exception was necessary to be reserved. Evidently, in the cases above alluded to, notwithstanding legible verdicts were taken out by the jury, such conduct was not regarded as fundamental error. In the case at bar it appears that an effort was made to show that the verdict was legible. There was testimony pro and con on this subject. The State, however, introduced one of the jurors who tried the case, and, occupying the standpoint he did, his evidence must be considered more persuasive on the question than that of any other witness who testified about the matter; and he says that he did not read the verdict, and that in his presence, while the jury were considering their verdict, he heard and saw no one else read it, and nothing was said by the jury in his presence in regard to said verdict. We have examined for ourselves the original verdict sent up to this court for inspection, and while it is possible for a person with a practiced eye and skill in such matters, with the light falling on the same in a particular direction, to read and decipher it, yet, even at this time, it is with some difficulty. The judge who tried the case certifies that, while the ink was yet fresh over the verdict, it was then not distinguishable to him; so, in our opinion, the weight of the testimony in this regard is to the effect that the jury who tried the case did not notice or read or attempt to read the obliterated verdict; and, if they had done so, in the absence of some showing of injury to appellant, we could not consider this as fundamental error, or such error as ought to have authorized the court below to grant a new trial when the matter was first presented to it on the motion for a new trial. Appellant also reserved a bill of exceptions to the remarks made by C. H. Yoakum, private prosecutor for the State, in his closing argument to the jury. The language used was as follows: "That he requested the jury to find the defendant guilty, and, if they did so, it would be approved by the people, and affirmed by the Court of Appeals of the State of Texas." The court shows in his explanation that no objection was made at the time this language was used, nor until after the jury returned their verdict, and had been discharged; and the objections were made for the first time in the appellant's motion for a new trial. If this language was considered objectionable and prejudicial to the rights of the appellant, it was his duty to reserve a bill of exception at the time, and ask a charge of the court on the subject, and on his failure to pursue this course he cannot complain. See, Henry v. State (Tex. Crim. App.), 30 S. W. Rep., 802; Kennedy v. State, 19 Tex. Crim. App., 618; Young v. State, Id., 536; Comer v. State (Tex. Crim. App.), 20 S. W. Rep., 547; Wilson v. State, 32 Tex. Crim. Rep., 22; Norris v. State, 32 Tex. Crim. Rep., 172; Rahm v.

State, 30 Tex. Crim. App., 310; Maxwell v. State, 31 Tex. Crim. Rep., 119. The judgment of the lower court is affirmed.

*Affirmed.*