RILEY JONES v. THE STATE.

No. 1281. Decided January 24, 1912.

Rehearing denied February 28, 1912.

**1.—Murder—Charge of Court—Manslaughter—Words and Phrases.**

Where, upon appeal from a conviction of murder, it appeared from the record that no complaint was made to the use of the word "transport," in the phrase, "in a sudden transport of passion aroused by adequate cause," in the charge of manslaughter, either by bill of exceptions or the motion for new trial, the objection came too late when made for the first time in the Appellate Court, to be considered.

**2.—Same—Continuance—Want of Diligence—Depositions.**

Where, upon trial of murder, the application for continuance did not show the proper diligence to enforce the attendance of the alleged absent witness, or to procure testimony by deposition if witness was out of the State, there was no error in overruling same.

**3.—Same—Evidence—Bill of Exceptions.**

Where the bill of exceptions did not show how the question and answer

were prejudicial to the defendant, and did not show how the court had committed error in permitting the questions to be asked and answered by the witness, the same could not be considered on appeal.

Appeal from the District Court of Newton. Tried below before the Hon. W. B. Powell.

Appeal from a conviction of murder in the first degree; penalty, imprisonment for life in the penitentiary.

The opinion states the case.

*Bisland & Adams,* for appellant.

*C. E. Lane,* Assistant Attorney-General, for the State.—On question of insufficiency of diligence and overruling motion for continuance: Buie v. State, 1 Texas Crim. App., 452; Fields v. State, 5 Texas Crim. App., 616.

On question of not procuring deposition of absent witness: Bowen v. State, 3 Texas Crim. App., 617; Adams v. State, 19 Texas Crim. App., 250; Hennessy v. State, 23 Texas Crim. App., 340.

PRENDERGAST, JUDGE.—The appellant was charged with the murder of Alvin Stephenson, convicted of murder in the first degree, and his punishment assessed at confinement in the penitentiary, for life.

It is unnecessary to give any extended statement of the evidence. The appellant testified on the trial. He was then thirty-one years old. The deceased was his uncle; sixty-seven years old at the time of the killing. Appellant testified that some trouble arose between him and deceased about two years before the killing. This grew out of appellant's action while on the grand jury about some charges then investigated against one of deceased's sons, appellant's cousin. This trouble was not serious.

A short time before the killing, trouble arose between appellant and his mother, the sister-in-law of the deceased, over eighty acres of land, she claiming it as a part of her homestead on which she had lived for thirty-one years and the appellant, recently before the killing, having filed on it as school land and claiming it against his mother as such. Appellant's contention was that the deceased was taking sides against him with his mother and introduced considerable testimony tending to show this. Among other things, he himself testified that he believed at the time and just before the killing that the deceased had been trying to break him up.

The State contended that the deceased had not taken sides with his mother against appellant but was having nothing to do with their controversy. The State offered testimony tending to show this. The State also contended that the appellant had been making preparations in carrying his gun, a 44 Winchester rifle, and seeking deceased for several days prior to and up to the time of the killing for the purpose of killing deceased, and introduced testimony tending to support this

contention. The State proved by one witness, the justice of the peace, that just four or five days before the killing, when appellant was discussing with him, the controversy between him and his mother and her complaint against him in his court and saying something about deceased, and in the run of the conversation between appellant and the justice of the peace, appellant at the time said: "I am afraid this thing is going to cause me to have to kill old man Stephenson yet," referring to the deceased. Notwithstanding the appellant testified on the trial, he did not deny making this threat.

The killing occurred about 1 o'clock in the day on February 19, 1911. The deceased was the express agent in the little railroad town of Deweyville in Newton County, where the killing occurred. He was also in the livery business and had a livery stable in this town. Just before the killing, the deceased had loaded some furniture on a wagon to haul and was going across the road or street in the town from a store called the Commissary, to his livery stable. He was in his shirt sleeves with his sleeves rolled up to his elbows. He was going north; the appellant and his brother Lee Riley were traveling along the same road or street in a buggy, going south, Lee on the right hand side, driving the horse and the appellant on the left hand side. The appellant's said 44 Winchester rifle was in the buggy leaning up against the seat between him and his brother. As the deceased and the appellant met, the deceased hailed the appellant who stopped. The deceased then went up very close to appellant and to the buggy. The appellant did not know whether he went to and caught hold of the wheel of the buggy or not. One of the State's witnesses testified that he did. The State introduced two eyewitnesses, among others, who saw all of what then occurred and who heard part if not all. It was clearly shown that the deceased was wholly unarmed and had nothing in either of his hands from the time he hailed and stopped the appellant, and after he was killed. On this point the appellant testified: "He was in his shirt sleeves all right. I never saw anything in his hands. I did not see any kind of arms on him at all at the time I commenced shooting. I never saw any pistol or anything on him from the time I first commenced talking to him until I quit. I didn't see him with any gun or anything to protect himself." Lee Riley, appellant's brother, who was in the buggy with him, on this point testified: "I never saw Mr. Stephenson have anything in his hands at the time Riley shot him. I didn't see any arms of any kind on him or around him." It was shown by several witnesses who heard the shooting and went to the deceased immediately after he was killed that the deceased had no arms of any kind on him or about him; that he fell when shot face foremost on the ground with his hands up towards his face.

One of the witnesses, Welsh, testified that he was sitting on the steps of the commissary store, about 135 feet from where the killing occurred; that immediately before the parties met, when the killing, occurred, the deceased had been into this commissary and passed out of it by where

he, the witness, was sitting on the steps, going north towards his livery stable; that his attention was directed to the deceased and to the appellant and his brother when they met, and here is his testimony of what and how it occurred: "There were two men in the buggy and as the buggy was about to pass the deceased or about even with each other the deceased held up his hand or beckoned to them and said, 'Hold on there, I want to speak to you a minute,' and the buggy stopped and the deceased approached the buggy pretty close—I think he was leaning against the front wheel while in conversation. The distance was about 135 feet from me and an ordinary conversation was a little hard to hear. I was about that far from them and more or less of the noise from the mill there drowned out the conversation. Anyhow, they talked for a moment or two in an ordinary tone of voice—didn't seem to be any agitation or hostile demonstrations, and I thought it was an ordinary conversation but after they talked, I judge probably two minutes, the accused became excited and shook his head in a negative way— I mean Riley Jones, the accused—and he raised his voice a little and I couldn't say for certain the sentence, I couldn't repeat it for sure, but near as I could make out an expression, he knew better, he didn't do it—but I couldn't exactly place the words; it was about that, however, and the deceased said, 'Why, I can prove it,' and repeated the same that he could prove it, said it the second time—and at that the accused seized a gun that was sitting between them, between the two men in the buggy, he seized that gun and swung it around in an attitude of shooting but he changed his mind the first move to shoot, wasn't more than a second, and drew the gun up and jumped to his feet and swung to his feet and jumped out of the buggy and brought the gun to his shoulder in a shooting position. He was at that time about twelve or fifteen feet from deceased. At the first motion to shoot the deceased threw up his hands about that position and held them up and backed off towards the back end of the buggy and kept backing off until he was about twelve or fifteen feet back. He didn't say anything while he was backing back and the accused seemed to be aiming at his head but the deceased kept his hands up pretty near in front of his face and he used kind of a pitiful moan of despair or cry and said, 'Oh, don't!' and the accused fired and the deceased began to stagger towards the center of the road, and while he was staggering the accused fired the second shot and the deceased fell on his face and hands in about that position, fell on the ground face downwards and in falling he swung with his head toward the steps and fell towards the buggy— swung around like in falling, and the accused rushed up then a couple of steps I judge, and he held the rifle pretty near over his back and fired down again. The deceased was struggling on the ground, reeling on the ground like he was apparently trying to get up, but he made a very feeble attempt at it, when the last shot was fired. Then the accused rushed back towards the buggy apparently with the intention of getting in and make like he was getting in and passed around and

had the gun carrying it in his left hand, and passed by the buggy and crossed the road, and when he got across the road he stopped and looked back and swung the gun around and looked back and changed the gun to his right hand and run on in front of the commissary, and the last I saw of him his gun was in his right hand."

Reintroduced, this witness also testified: "The defendant had his gun up to his shoulder the first shot I think. The second shot I think it was at his shoulder—the second shot was pretty close after the first one. Say this is the road here, the deceased fell in that position, his head was lying south. The body was lying in that position, a little diagonally. The deceased fell in about that position. It would be difficult to tell how close he was to him and how he had the gun, but it was about in that position—his back towards me—the best I could see he had it about like that. The last shot Mr. Stephenson had his hands this way—he was getting weaker. When he fell on the ground he sort of floundered around trying to raise on his feet and couldn't. I was closer to his feet than any other part of his body. His shoulders were the most elevated—he was down on his hands like he was trying to raise up. He would raise his shoulders up and down, that is when the last shot was fired." The State introduced other witnesses who saw the killing, who testified substantially the same as the witness Welsh, above quoted.

The appellant himself testified that as soon as he killed the deceased he ran, and for awhile hid himself under a pile of lumber, but that as his two dogs followed and stayed where he was, he concluded that he would have to get away from there and then ran, leaving town and the roads and went into a briar thicket, remaining there till night; that he tied his dogs to keep them from following him and traveled nearly all that night towards Orange, going some eighteen miles; that he was scared and afraid; that a short time before daylight or about daylight he reached the house of an acquaintance, and after discussing the matter, concluded to give up. Whether he voluntarily gave up or whether this party with whom he stopped, went and informed the sheriff who arrested him, where he was, is not clear. Immediately after the killing appellant's brother Lee also left, and went to some friend several miles away where he remained till after night. Then during that night he went to Orange in Orange County.

The appellant testified, among other things, that immediately before the killing he saw his uncle, the deceased, standing at the steps of the commissary; that he paid no particular attention to him. Appellant and his brother were driving up the street or road and the next he saw of the deceased he was coming meeting them and just as he got opposite them, his version of it, is as follows: "He threw up his hands and said, 'Hold on there.' He said, 'By God, I want to see you a minute.' We stopped and he came up and he said, 'I understand you have accused me of trying to break you up,' and I said, 'No, I haven't done it,' and it seems he was pretty mad, and I told my brother to drive on,

and we started up and I guess moved about probably half a turn of the wheel, we had gone three or four feet probably, and the old man said, 'Stop, by God, I'll kill the pair of you.' He was standing just as I am now and threw his hands up that way and turned his shoulder to me and put his hands up in about that position, a little above his pants waist. When he first done that he was standing facing me and he turned his side to me about that way, and I jumped from the buggy and fired three shots and I fired them just about as fast as any ordinary man could use a gun, just as fast as I could. He fell. In fact, the last shot, the last time the gun fired, it was at random—there were only two shots that could be counted anything like an accurate shot; when I shifted the gun the third time the smoke was in front of me and I couldn't see him and I jerked the lever down the third time the gun fired. I did not walk up to him and shoot him after he was down on the ground—I never made a step towards him. I then turned and run." Appellant's brother, Lee, testified on this point substantially as did the appellant.

The uncontroverted testimony shows that one of the shots took effect in the deceased's back about four inches below where his arm joined his body, went straight through the body striking the heart and came out at the left nipple. Another shot went apparently straight in the back, near the spine, went straight through into the stomach, but the ball did not make its exit. This ball, it seems, struck a little chain that the deceased had swung over his right arm which was attached to an expressman's pouch and carried by him on his right arm.

The court correctly charged on murder in the first and second degrees, manslaughter and self-defense. There was no complaint whatever of the charge of the court in the lower court by bill of exceptions or in the motion for new trial. The only complaint now made in this court as to the charge of the court was the use of the word "transport" in the phrase "in a sudden transport of passion aroused by adequate cause" one time in the charge on manslaughter. As no complaint was made of this by exception to the charge at the time, or on motion for new trial, it comes too late, even if it was improper, and we can not now consider it.

Appellant also complains that the court committed reverrsible error in overruling his application for a continuance on account of the absence of Miss Edna Kelley. This motion was made and overruled on March 13, 1911. The case was called for trial on that day. The judgment of the court further shows that because some of the jurors summoned on the special venire were absent when the case was called and the motion for continuance overruled, upon motion of the defendant, the cause was postponed until Wednesday, March 15, at 1 o'clock p. m., at which time the case was again called and both parties announced ready for trial. The trial was concluded sometime on March 17, 1911. The only diligence shown by appellant to secure the attendance of said absent witness is stated by him as follows: "That he has used the fol-

lowing diligence to procure her attendance at this term of court; that on the 3d day of March, 1911, he caused a subpoena to be issued to Newton County, where he was informed and believed that Miss Edna Kelley could be found, and had said subpoena placed in the hands of A. M. Sharver, sheriff of said county, and that said subpoena was returned into the court on the 11th day of March, said return not showing service upon said witness, and not showing why said witness was not served, and said subpoena is hereto attached and made a part hereof; that the defendant is informed that the said witness is temporarily absent on a visit at Bluett Post Office, in the Parish of Calcasieu, State of Louisiana; that at the time of the difficulty she was at Deweyville in Newton County, and defendant at the date of the making of said subpoena, believed that said witness was still to be found in said Newton County; that witness' home is in Jasper County, Texas, at or near Bess May, and that her absence in Louisiana is only temporary."

In Walker v. State, 13 Texas Crim. App., 618, this court, through Judge Willson, said: "We know of no rule of law which requires the State to show a want of diligence in opposition to a continuance. It devolves upon the defendant to show, affirmatively and distinctly, that he has used all the diligence to obtain his witness required by law." Again, in Long v. State, 17 Texas Crim. App., 128, this court, through Judge White, said: "The onus is upon the defendant to establish the exercise of diligence in support of an application for a continuance." Judge White, in his Annotated Code of Criminal Procedure, section 599, says: "An application for continuance must state the residence of the witness; and when it states that a witness is temporarily absent it should state how long he had been so absent, and when he left the county of his residence. Dove v. State, 36 Texas Crim. Rep., 105; Vanwey v. State, 41 Texas, 639; Wolf v. State, 4 Apps., 332; Thomas v. State, 17 Apps., 437; Colton v. State, 7 Apps., 50. Where the application for continuance did not show at what time the defendant ascertained that the witness was a resident of the county to which he had a second attachment issued, the diligence was insufficient. Hughes v. State, 18 Apps., 130."

In Mitchell v. State, 36 Texas Crim. Rep., 278, this court, through Judge Hurt, among other things, said: "It will be further observed that although the trial in this case lasted four or five days, no effort was made to procure the attendance of the absent witnesses after the trial began. For aught that appears, by the use of reasonable diligence, they could have been obtained in time to have testified in the case." Again, the effect of the decisions are that if the case be one in which the depositions of an absent witness is authorized diligence to procure such deposition must be shown. Harvey v. State, 35 Texas Crim. Rep., 545; De Alberts v. State, 34 Texas Crim. Rep., 508; Stouard v. State, 27 Texas Crim. Rep., 1.

The State, in its brief in this case, contends that this court will take

judicial knowledge that Newton County adjoins Calcasieu Parish, Louisiana, and that said parish is about twenty miles from the county seat of Newton County, and yet, during the eight days after the return of the subpoena and before the conclusion of the trial, appellant made no effort to take the depositions of the absent witness, citing Bowen v. State, 3 Texas Crim. App., 617; Adams v. State, 19 Texas Crim. App., 250; Hennessy v. State, 23 Texas Crim. App., 340, and other cases. Whether the State's contention on this point is well taken or not, it is unnecessary to say, but the burden was on the appellant to show when he learned of the temporary absence of the witness in Louisiana, when she would return and whether or not he could have taken her depositions. The application as to diligence shown above does not show when he learned the witness was absent from Newton County; nor does it show when he had the subpoena placed in the sheriff's hands. The subpoena, although called to be attached to the application, does not appear in the record anywhere, and the application does not show why an officer did not make a return thereon. It does not show how long the witness would be temporarily absent in Louisiana, nor that she had not returned prior to the actual time of the trial and that he could not procure her attendance. It also shows that her home was in Jasper County at or near the town of Bess May. No process was issued to that county, nor does the application show that she had not returned to her home in ample time to have been secured as a witness in this case if any kind of diligence had been used for that purpose. The application for continuance was wholly insufficient to show diligence and the court did not err in overruling the same.

The only other complaint appellant has is shown by his bill of exceptions No. 2, which we copy in full as follows:

"State of Texas　　　　　　　IN THE DISTRICT COURT OF

　　v.　　　· No. 1248.

Riley Jones.　　　　　　　NEWTON COUNTY, TEXAS.

"Be it remembered that on a trial of this cause Mrs. Caroline Field, the mother of defendant, was placed upon the stand as a witness for the State, and having testified that at the time of the killing there had been a complaint filed against defendant, by her, and having further testified that the complaint was filed by the advice of Sud West and Allen Smith, the State asked her the following question:

" 'Before you filed this complaint didn't you go down to the commissary with your face all beaten up and meet Mr. Alvin Stephenson and Mr. Sud West sitting on the steps of the commissary of the Sabine Tram Company, and make a complaint to Mr. Alvin Stephenson that Riley had been whipping you, and didn't he tell you at that time, "Now, this is a family affair, and I don't want to have anything to do with it, and you have got two brothers living here and you go to them for advice?" '

"To which question defendant objected, and stated to the court that

he had two objections to that question, first, because it was immaterial, because it is a State witness and the witness has shown no disposition to avoid any of the examination, and in that connection counsel stated to the court that the defendant had excused the witness when the rule was called for, and informed the State that he would not use her as a witness, and that she was the State's witness and the question was leading, and he further objected to it because it was leading, immaterial and calculated to prejudice the jury, because it had been asked in such a manner that even the objections to it now even if the witness was not allowed to answer it, had its effect on the jury as prejudicial.

"Which objection was, by the court, overruled to which defendant excepted and the witness was permitted to answer, 'Yes, sir, it is true alright.'

"The defendant says that these proceedings are highly prejudicial to this defendant, and he comes now and asks that the same be allowed and filed as a part of the record of this case as his bill of exception No. 2." Then follows the signature of his attorneys and the approval and signature of the judge.

"A bill of exceptions should be full and explicit in its allegations, that the matters presented for revision may be comprehensible without recourse to inference, and its statements must be so full and certain that in and of itself it will disclose all that is necessary to manifest the supposed error." Suit v. State, 30 Texas Crim. Rep., 319. As was said of a bill of exceptions in the case above noted, we say of this: "We do not think the bill of exceptions sufficiently sets out the attendant facts and circumstances to require us to pass upon the supposed erroneous ruling. It is not the admission of all incompetent or illegal evidence in a case that would require its reversal." Suit v. State, 30 Texas Crim. Rep., 319. And as was also said in the same case further on, on the same page: "Again, it is a well recognized rule that matters become relevant, competent, and admissible, because of the admission of other facts or circumstances, when otherwise the evidence of said matters, as an original question, would be irrelevant, incompetent, and inadmissible." (James v. State, 63 Texas Crim. Rep., 75, 138 S. W. Rep., 612.) It has many times been held by this court, as stated by Judge White, in his Annotated Code Criminal Procedure, p. 734: "A bill of exceptions to the admission of evidence which merely states that the same was irrelevant and immaterial is entirely too general."

The bill, in no way, meets the requisites as to the point of the question being leading as laid down and established by this court in Carter v. State, 59 Texas Crim. Rep., 73. There is no attempt by the bill to show how the question and answer was prejudicial to the appellant. Neither does it appear therefrom what the evidence was on that or any other point in the case so that we can tell therefrom whether the question and answer, in any way, prejudiced the appellant. It is more than probable that if all the facts on this question were shown by this bill

that this question and answer would be entirely permissible and proper. As the matter is presented to us there is no reversible error shown.

The judgment will, therefore, be affirmed.

*Affirmed.*

[Rehearing denied February 28, 1912.—Reporter.]