## Hubert Cotton v. The State.

### No. 5523. Decided December 10, 1919.

**1.—Murder—Jury and Jury Law—Special Venire—Motion to Quash.**

Article 661, C. C. P., seems to contemplate the exhaustion of the regular venire before resort is had to the special venire list, and when such regular list is exhausted to such a point as that not enough names remain thereon to make the number ordered on any special venire, but any of the regular venire remain, there is no reason why those on the special list should not be placed in the box with such remainder, and the venire ordered be drawn therefrom, which was done in the instant case; besides, no injury appeared, and there was no error in overruling the motion to quash the special venire.

**2.—Same—Jury and Jury Law—Challenges for Cause—Harmless Error.**

Where defendant complained that the trial court overruled his challenges to jurors who stated that they had opinions regarding the case, but it appeared from the record that all such jurors were challenged by the defendant, and that peremptory challenges were not exhausted, the error, if any, is harmless; besides, the bills of exception were insufficient. Following: Eads v. State, 76 Texas Crim. Rep., 647, 176 S. W. Rep., 574, and other cases.

**3.—Same—Evidence—Declaration of Defendant—Ill-feeling.**

Upon trial of murder, there was no error in admitting testimony as to what was said by defendant to his brother, just after the fatal killing; nor testimony as to ill-feeling between the parties.

**4.—Same—Evidence—Bill of Exceptions.**

Where the bill of exceptions claimed that the questions propounded to the defendant were argumentative, but the record showed that they were not, there was no reversible error.

**5.—Same—Evidence—Acts of Third Parties.**

Where, upon trial of murder, defendant claimed that deceased and his brother were armed with sticks and other weapons, there was no error in admitting testimony that a witness an hour or two after the homicide took a search light, went to the scene of the homicide and made diligent search but failed to find any stick or other weapon; besides the bill of exceptions were insufficient.

**6.—Same—Res Gestae—Evidence—Bill of Exceptions.**

Upon trial of murder, there was no error in admitting testimony developing the *res gestae* of the killing, a few minutes after it occurred; besides, the bill of exceptions was insufficient.

**7.—Same—Evidence—Bill of Exceptions.**

Where objection to the question, as to former testimony was afterwards withdrawn and the same was admitted in evidence, there was no error.

**8.—Same—Evidence—Part of Conversation—Rule Stated.**

When a witness is attacked by proof of a part of a conversation con-tradicting his testimony, the other side has the right to prove all that he said at the time relative to the same subject.

**9.—Same—Charge of Court—Manslaughter—Adequate Cause—Two Assailants.**

Where, upon trial of murder, the defendant claimed that the deceased and his brother made an attack upon him and his brother, and the evidence raised the issue of self-defense and manslaughter, the court's charge on manslaughter was too restrictive, and unduly limited the facts which might be considered as reducing the offense to manslaughter, in that it did not allow the jury to consider the acts of the brother of deceased in arriving at whether or not there was a manslaughter condition of the mind of the defendant, and refusing a requested charge which presented this phase of the case. Fol-lowing: Garcia v. State, 70 Texas Crim. Rep., 485, and other cases.

**10.—Same—Charge of Court—Maiming or Disfiguring.**

Where, upon trial of murder, there was no evidence in the case that the purpose of deceased or his brother was to main or disfigure defendant or his brother, a charge on the law of this phase of the case should not have been submitted to the jury.

**11.—Same—Mutual Combat—Charge of Court.**

Where, upon trial of murder, the court submitted a requested charge by the State on the law of mutual combat, and the record showed that there was no evidence to support such charge the same was reversible error; there being no agreement either by words or acts between the parties to meet and fight, with or without deadly weapons. Following: Reese v. State, 49 Texas Crim. Rep., 242, and other cases.

**12.—Same—Requested Charges.**

Where most of the requested charges were either covered by the main charged, or refused as being on the weight of the evidence there was no reversible error.

**13.—Same—Conduct of Relatives of Deceased—Practice in District Court.**

Where, upon an appeal from a conviction of murder, the complaint as to the conduct of the relatives of the deceased at the time of the trial will not likely occur upon another trial the same need not be considered; how-ever, such conduct should not be permitted in the presence of the jury.

Appeal from the District Court of Hunt. Tried below before the Hon. Wm. Pierson, judge.

Appeal from a conviction of murder; penalty, twelve years im-prisonment in the penitentiary.

The opinion states the case.

*Neyland & Neyland, Crosby & Harrell,* and *B. B. Sturgeon,* for ap-pellant.—On question of motion to quash special venire: Gabler v. State, 49 Texas Crim. Rep., 623; Horn v. State, 50 id., 404; Wallace v. State, 50 id., 374; Mays v. State, 50 id., 165; Osborn v. State, 23 Texas Crim. App., 431.

On question of evidence as to what occurred prior to time of killing: Brummley v. State, 21 Texas Crim. App., 222; Johnson v. State, 22 id., 206; Ball v. State, 29 id., 107; Fuller v. State, 30 id., 559.

On question of testimony as to what occurred immediately after homicide: Bibb v. State, 83 Texas Crim. Rep., 616, 205 S. W. Rep., 135; White v. State, 202 S. W. Rep., 737; Crenshaw v. State, 48 Texas Crim. Rep., 77.

On question of court's charge on manslaughter: Cochran v. State, 28 Texas Crim. App. 422, and cases cited in the opinion.

On question of mutual combat: Christian v. State, 46 Texas Crim. Rep., 47, and cases cited in the opinion.

On question of conduct of relatives of deceased: Hamilton v. State, 36 Texas Crim. Rep., 372; Parker v. State, 33 id., 111.

*C. M. Cureton,* Attorney General, *W. J. Townsend,* Assistant Attorney General, *Clark & Sweeton,* for the State.—On question of motion to quash special venire: Williams v. State, 29 Texas Crim. Rep., 89; Charles v. State, 13 id., 658; Franklin v. State, 34 Texas Crim. Rep., 625; Vasquez v. State, 172 S. W. Rep., 225; Mays v. State, 96 id., 329.

On question of insufficient bills of exception: Singleton v. State, 74 Texas Crim. Rep., 71, 167 S. W. Rep., 46; Mauney v. State, 210 S. W. Rep., 959; Hunter v. State, 59 Texas Crim. Rep., 439, 129 S. W. Rep., 125.

On question of making search for deadly weapons on scene of homicide; Diaz v. State, 53 S. W. Rep., 632; Seeley v. State, 43 Texas Crim. Rep., 66.

On question of *res gestae;* Simms v. State, 67 Texas Crim. Rep., 98, 148 S. W. Rep., 786.

On question of court's charge on manslaughter: Mitchell v. State 41 S. W. Rep., 816; Magruder v. State, 33 S. W. Rep., 233; Sargent v. State, 35 Texas Crim. Rep., 325; Blanco v. State, 57 S. W. Rep., 828; Young v. State, 54 Texas Crim. Rep., 417, 113 S. W. Rep., 276; Henson v. State, 74 Texas Crim. Rep., 277, 168 S. W. Rep., 89; Drake v. State, 68 Texas Crim. Rep., 440; 153 S. W. Rep., 848.

On question of mutual combat: Gardner v. State, 59 S. W. Rep., 1114; Mitchell v. State, 41 id., 816; Habel v. State, 28 Texas Crim. Rep., 588; Anthony v. State, 62 Texas Crim. Rep., 138, 136 S. W. Rep., 1097.

On question of conduct of relatives of deceased: Vaughn v. State, 51 Texas Crim. Rep., 180, 101 S. W. Rep., ˙445; Coffman v. State 73 Texas Crim. Rep., 295, 165 S. W. Rep., 939.

LATTIMORE, JUDGE.—Appellant was convicted of murder in the District Court of Hunt County, and his punishment fixed at

twelve years confinement in the penitentiary. The facts will suffi-
ciently appear from the opinion.

The first error complained of is that the court overruled a mo-
tion to quash the special venire because the same was not drawn in
accordance with law. It appears that at the beginning of the
term of court at which this trial was had, 288 jurors were drawn
by the jury commissioners for service as regular veniremen during
the eight weeks of the term, and in addition, 150 names were drawn
by said commissioners, to constitute the special venire list. It
also appears that other murder cases were up for setting and the
drawing of juries prior to the instant case, and that when one of
said cases, spoken of in the record as the Graham case, was reached
just before the instant case, and the clerk prepared to draw the
special venire in the Graham case, he found that all of the 288
names on the regular venire had been drawn for other special
venires, except twenty. He thereupon proceeded to place in the
box containing the slips with the names of said twenty jurors,
other similar slips, such as is required by law, containing the names
of the 150 men, composing the special venire list, and after mixing
them thoroughly, said clerk drew therefrom the sixty names re-
quired to compose the special venire in the Graham case; and
likewise, from the remaining 10 names, he proceeded to draw the
special venire required in the instant case. Nine of the men drawn
for service on this special venire were among the twenty remaining
in the regular venire list.

The court heard evidence in support of appellant's motion to
quash, which substantially established what has just been said.
After hearing said evidence, the court overruled said motion, and
in his qualification to the bill of exceptions reserved to such
action, states that none of the nine mentioned served on the jury
in this case; and also that none of them were challenged by the
defendant peremptorily, and further, that the challenges of the appel-
lant were not exhausted when the jury was secured. We are unable
to see any error in the action of the court. Our statute, Article 661,
C. C. P., seems to contemplate the exhaustion of the regular venire
list before resort is had to the special venire list, and when such regu-
lar list is exhausted to such a point as that not enough names remain
thereon to make the number ordered on any special venire, but any
of the regular venire remain, we see no reason why those on the
special list should not be placed in the box with such remainder, and
the venire ordered be drawn therefrom. It seems to be expected that
the particular venire be composed of those on the regular list, if
there be enough, and if there are not, then of those on the special
list. Both lists are drawn by the same jury commissioner; both drawn
to serve if needed. No injury appears, and the motion was properly
overruled.

Complaint is made to the court's overruling appellant's challenges to jurors who stated that they had opinions regarding the case. It appears that all such jurors were challenged by the appellant, and in view of the fact that his peremptory challenges were not exhausted, the error, if any, would be held harmless. This Court has often held that bills of exceptions disclosing that the only character of objection made is that the evidence is immaterial, irrelevant and prejudicial, will not be considered, because said objections are too indefinite, and would require an inspection of the entire statement of facts and record to enable this Court to determine the existence of such grounds. We observe that bills Nos. 5, 6, 7, 8, 9, 14, 17, 18, 20 and 22, are open to this objection. Pangburn v. State, 56 S. W. Rep., 72; James v. State, 65 Texas Crim. Rep., 69, 144 S. W. Rep., 252; Barfield v. State, 41 Texas Crim. Rep., 19; Eads v. State, 76 Texas Crim. Rep., 647, 176 S. W. Rep., 574.

A bill of exception was reserved to the testimony of Mrs. Tapp, as to what was said by appellant and Ira Cotton just after the fatal killing. No error appears in this. The appellant and his brother were shown to be together, and the remarks complained of were between the two; nor was it error to allow the questions and answers of the wife of Ira Cotton, to the effect that she knew that Ira did not like the Greens, and that there was ill-feeling between them. Gabler v. State, 49 Texas Crim. Rep., 623; Powers v. State, 23 Texas Crim. App., 64; Graham v. State, 28 Texas Crim. App., 593.

Bill of exceptions No. 12 presents a large number of questions propounded to appellant, as to his testimony at former times. The only objection was that same was argumentative. We have examined the same, and are unable to agree with the contention.

Objection was made to the evidence of the witness Robinson, to the effect that he returned from Greenville an hour or two after the homicide, took a searchlight, went to the scene of the homicide and made diligent search, but failed to find any stick or other weapon. The objection made was that it was immaterial, irrelevant, and occurred several hours after the killing, and after a number of other persons had been on the ground. In the absence of other facts set out in the bill, same presents no matter of possible injury. If the fact of finding no weapon was material, the State or defendant either, would be entitled thereto, and if such matter was not material, facts should be stated in the bill showing its lack of materiality.

The matters complained of in bill of exceptions No. 15 occurred within ten minutes after the shooting, and are but the development of the *res gestae*. The only ground of objection to this evidence is that it is immaterial, irrelevant, and prejudicial.

Bill of Exceptions No. 16 complains that the appellant was not allowed to ask a witness certain questions as to her former testi-

mony. The bill discloses, however, that she did answer such question, and the court's explanation shows that the matter asked about, and sought to be brought out, was later introduced by appellant and read to the jury, as a part of the former testimony of said witness.

No error appears in the opinion of the court in the matters complained of in Bills Nos. 20 and 21.

When a witness is attacked by proof of a part of a conversation contradicting his testimony, the other side has the right to prove all that he said at the time relative to the same subject. This statement disposes of the matters complained of in Bills of Exceptions Nos. 23, 24, 25, 26 and 27.

Complaint is made of the seventh paragraph of the court's charge, which is as follows:

"The next lower grade of culpable homicide than murder is manslaughter. Manslaughter is voluntary homicide committed under the immediate influence of sudden passion arising from an adequate cause, but neither justified nor excused by law. By the expression "under the immediate influence of sudden passion," is meant that the act must be directly caused by the passion arising out of the provocation. It is not enough that the mind is merely agitated by the passion arising from some other provocation. The passion intended is either one of the emotions of the mind known as anger, rage, sudden resentment or terror, rendering it incapable of cool reflection.

By the expression "adequate cause" is meant, such as would commonly produce a degree of anger, rage, sudden resentment or terror in a person of ordinary temper, sufficient to render the mind incapable of cool reflection. The following are deemed adequate causes: *Any act, or words, or both, on the part of deceased,* which, of themselves, or together with any other facts or circumstances shown by the evidence as transpiring at the time of or before the homicide as they appeared to, or were known to, or believed by, the party killing, which, when viewed from the standpoint of the slayer, as they appeared to him, and which were calculated to and did produce in the mind of the slayer that passion or emotion known as anger, rage, sudden resentment or terror, rendering it incapable of cool reflection."

The exception reserved to this part of the charge, complains that same is too restrictive, and unduly limits the facts which might be considered as reducing the offense of appellant, if any, to manslaughter, and because the same did not allow the jury to consider the acts of the brother of deceased, in arriving at whether or not there was a manslaughter condition of the mind of appellant. In this connection, appellant offered his special charge No. 6, which is as follows:

"Gentlemen of the Jury:

You are further instructed that while by the expression "under the immediate influence of sudden passion," is meant that the provocation must arise at the time of the killing and that the passion is not the result of a former provocation, still, in determining whether or not the provocation arising at the time of the killing was sufficient to produce sudden passion, as defined in the main charge, the jury should consider all the other words, acts and conduct of the deceased toward the defendant occurring prior to the killing, and the words, acts and conduct of Tom Green and Henry Green and their father at the time of and just prior to the killing, and if the provocation arising at the time of the killing, when viewed and taken in connection with all the preceding acts, conduct and words of the deceased, and all the words, acts, and conduct of the said Tom Green, Henry Green and their father toward defendant, were sufficient to produce the sudden passion as herein defined, then such provocation would be sufficient."

We are of opinion that the exception to the charge was well taken, and that substantially the special charge quoted should have been given. Said paragraph is open to the criticism that in specifically mentioning the acts and words of deceased as being adequate cause, the jury might have thereby been led to believe that they should not consider the acts and conduct of appellant's brother, who was acting with him.—Garcia v. State, 70 Texas Crim. Rep., 488; Bracken v. State, 29 Texas Crim. App., 362; Byrd v. State, 39 Texas Crim. Rep., 609; Stacy v. State, 48 Texas Crim. Rep., 95; Brown v. State, 54 Texas Crim. Rep., 121; McLaughlin v. State, 10 Texas Crim. App., 357.

In the Byrd case, *supra*, after enumerating a number of acts of deceased which might be taken to constitute adequate cause, the trial court further proceeded to charge as follows:

"—; and you further believe from the evidence that at the time of the killing the defendant was laboring under such a transport of passion, produced by either or all the adequate causes explained and submitted to you in the preceding charges, or caused by any other condition or circumstance in evidence which was capable of creating, and which did create, such sudden passion as rendered the mind of the defendant incapable of cool reflection at the time of the killing,—you will find the defendant guilty of manslaughter."

This Court, through Judge White, held the charge too restrictive.

In the Brown case, *supra*, where two were acting together, and reference was had to only one in the charge, this Court held the charge insufficient. Likewise in the Garcia case.

We are also of opinion that that portion of paragraph 10 of the court's charge relating to homicide being permissible when

inflicted to prevent, maiming, or disfiguring, should not have been given, as there was no evidence in the case that the purpose of deceased or his brother was to maim or disfigure appellant or his brother, and the only purpose served by such charge was to confuse the issues and possibly lead the jury to give emphasis to the fact that unless the homicide, unquestionably committed by appellant, was to prevent such maiming or disfiguring, same would not be justifiable. This part of the charge was duly excepted to by appellant.

The court, at the request of the State, gave the following special charge on mutual combat:

"Gentlemen of the Jury:

You are instructed that where two or more persons, mutually and voluntarily enter into a conflict with deadly weapons and where one of the parties kills another during such deadly conflict, the killing is murder or manslaughter in accordance with the intent with which such conflict was entered into and such killing was done. If, therefore, you find from the evidence that the Cotton boys on one side, and the Green boys on the other, voluntarily and mutually entered into a conflict with deadly weapons in pursuance of an agreement or understanding, either express or implied, and if you further find that while engaged in such deadly conflict, if any, the defendant and his said brother were acting together with a common purpose and design and that during such conflict, one of them killed the deceased, George Green, in defense of himself or of his brother, or that they both killed him in defense of themselves or one of them, then if such conflict, if any, was entered into by defendant with the intent to kill the deceased, he would be guilty of murder; but, if such conflict, if any, was entered into with no intention to kill the deceased, but that during the conflict the defendant's mind became inflamed by anger, rage, sudden resentment or terror produced by an adequate cause, as explained in the main charge, then he would be guilty of manslaughter."

The appellant duly excepted to this charge, because there was no evidence to support it, and same did not correctly state the law, and same allowed the jury to believe that a mutual combat could result from an implied agreement.

We have carefully examined the evidence in this case, endeavoring to ascertain if there be any evidence calling for such a charge. We briefly state that portion of the evidence pertinent to this question: It seems that all the parties were going home from church in the night-time, shortly before the killing. Appellant was a boy seventeen or eighteen years of age, and his brother Ira Cotton was about twenty-one. The two Green boys, George and Tom, were both grown men, and the heads of families. Appellant weighed about 125 pounds, his brother about 140, and the two

Green brothers 165 or 170 pounds each.  As the parties were pass-
ing along the road, Ira Cotton was in front in a buggy with a
young lady whom he had married at the time of this trial.  Appel-
lant was driving a buggy just behind Ira, accompanied by his
sweetheart.  While driving along the road they were overtaken by
the Greens in a car, and one of the Greens called out to appellant
to give the road, which he proceeded to do.  As the car containing
the Greens passed Ira Cotton, who had already given the road,
the deceased called out to Ira Cotton, and there was testimony that
the women in the car made some remarks about "all trash giving
the road" or something of that kind.  We might pause here to re-
mark that there is no controversy in the record as to there having
been trouble between the two families, and that they were not on
good terms.  The evidence discloses that at the time just mentioned,
all the parties were traveling north, and that a little further on the
road forked—one road going east, passing the place where ap-
pellant's sweetheart lived; the other road going west, passing an-
other church and the homes of the two Green boys, which were
situated a few hundred yards apart, and continuing on, passing the
home of Ira Cotton's sweetheart and the home of the two Cotton
boys.

Tom Green testified that after he got home that night he saw
Ira Cotton pass back by his house in his buggy alone, going East
and that he then went down to deceased's house, apprised him
of that fact, and the two of them stood around waiting.  Presently
they heard appellant and Ira coming along the road, and Tom
says he heard one of the Cotton boys call to the other and say:
"Where do you reckon they will come out?" and the other replied
"They are too cowardly to come out."  Tom says that his brother
George Green's house was about 300 feet from the road, and at
once upon hearing the words just mentioned, deceased started down
toward the road, and that he accompanied him; that they reached
the road about the time the Cotton boys came along; that Ira's
buggy was in front and was a little past them when the two Green
boys stepped into the road; that deceased addressed a remark to
the Cottons, which, according to Tom Green, was "No, we are not
cowards to come out here; we are out here, and if you all are
looking for anything, we are out here."  This remark, according
to appellant, was "God dam you, get out; by God, we have got
you."

The witness Tom Green further says that Ira Cotton, who was
in his buggy in front of appellant, then said: "Well, we never
turn nothing like that down," and got out of his buggy on the
far side, and reached under some tie-ropes lying in the buggy, got
an axe-handle and started around back of his buggy; that appel-
lant got out of his buggy and was standing near the front wheel
with his hand in his hip-pocket; that deceased told appellant to

take his hand out of his pocket, and that appellant pulled it out with a pistol in it, and at once began firing, shooting deceased twice and Tom four times; that Ira then ran around his buggy and struck both deceased and the witness with an axe-handle. This witness stoutly affirms that neither he nor deceased had any kind of weapon, clubs, or sticks in their hands during the difficulty, or that either of them expected to have a fight, that is, as far as the witness knew. He further swore that his only purpose in going down to the road was to help George if he needed help, and that he neither did nor said anything after appellant fired his pistol. Nothing appears to have been said by appellant after the parties met until after the shooting. Appellant testified that for some time he had been carrying the pistol under the cushion of his buggy, fearing trouble with the Greens, but that as far as he knew, his brother Ira did not know that he was carrying said pistol, or that he had it there the night of the trouble; that after coming to the above mentioned fork of the road, he turned east and carried his sweetheart home; stayed there and talked to her from fifteen to twenty minutes; then started to his home in his buggy, along the road which would carry him past the home of the Greens; that down near a church building on that road he came upon his brother Ira, sitting in his buggy, and asked him what he was doing there? Ira said "Didn't you hear what George Green said? He said he would get you as you came by." Appellant testified that he told Ira he didn't think George would do that, and Ira said, "Well, you drive on behind me;" that he drove on west behind Ira; that before they got opposite the home of the Greens he hollered to Ira and asked him where he thought they would come out, and that Ira said, "Further up the road," or something to that effect. When nearly opposite the home of the Greens, the Greens stepped into the road, and George Green said: "God dam you, get out. By God, we have got you!" That both the Greens had clubs in their hands; that Ira Cotton's horse shied and stopped, and that he, appellant, got out of his buggy; that after he got out he took said pistol from under his buggy seat and put it in his pocket; that he didn't notice what Ira was doing; that about this time George Green started towards him and threw out his hand, and appellant thought it contained a gun, and swore that he believed it was a gun; that George said: "By God; take that hand out of your pocket," and appellant said he at once pulled his gun and commenced shooting at George, and Tom ran at him, and he shot Tom. Appellant further testified that he got the pistol out and put it in his pocket to protect his brother and himself; that he did not know what the Greens were going to do, but they looked like they were going to do some serious injury. After the fight was over and they were going home, he saw an axe-handle in his brother's hand, but he did not know before, that Ira had the

axe-handle, nor did he suppose that Ira knew that he, appellant, had the pistol.

We have given this much of the testimony, as bearing upon the question of mutual combat, and find ourselves unable to find any evidence therein, or in this case, calling for the charge given. That there was no agreement to meet and fight there with or without deadly weapons, is testified to by all the parties. Without such agreement, which must be established either by words or acts, such a charge could only be injurious and serve the purpose of limiting, if not wholly depriving appellant of his claim of self-defense. We have been unable to find any decision holding that a mutual combat, in pursuance of an implied agreement, is a thing recognized in criminal law. The mere fact that two parties fight, and in that sense it is mutual, does not necessarily in law imply an agreement to fight, nor banish from the case the right of self-defense. Reese v. State, 49 Texas Crim. Rep., 242; Waldon v. State, 34 Texas Crim. Rep., 92. Nor would the fact that appellant, while on the road home driving behind his brother who stopped his buggy first, stopped his buggy and got out and held his hand on his pistol in his pocket, warrant a charge on mutual combat. Certainly, if, while so standing, he thought George Green accompanied his command to take that hand out of his pocket with the presentation of a pistol, the fact that appellant drew his pistol and fired, presents no issue of mutual combat.

Appellant denied that his brother ever said "We never turn anything like that down," and denied any belief that there would be any trouble or a conflict until the Greens appeared. Where is any evidence of mutual agreement to fight with deadly weapons? Such an agreement must be a two-sided agreement, or it is lacking in mutuality. As stated above, Tom Green says that he and his brother had no weapons, and had made no such agreement. Appellant swore that he did not know his brother had the axe-handle until after the fight, and that his brother did not know he had the pistol, and that they had made no such agreement. As we view it, the charge was both erroneously written and was without evidence to support it, and was certainly injurious to appellant. Clay v. State, 44 Texas Crim. Rep., 129; Brazzill v. State, 28 Texas Crim. App., 584; Polk v. State, 30 Texas Crim. App., 657; Everett v. State, 30 id., 682; Armsworthy v. State, 49 Texas Crim. Rep., 622; Voight v. State, 53 Texas Crim. Rep., 270.

We have examined the special charges asked by appellant, and have concluded that most of them were either covered by the main charge, or improper as being on the weight of the evidence.

The conduct of the relatives of the deceased at the time of the trial, complained of, will likely not occur upon another trial. We wish to state, however, that such conduct should not be permitted in the presence of a jury trying a man for his life. The same con-

stitutes a powerful appeal to the sympathies and sensibilities of men, whose effort and duty it is, and should be, to follow the law and decide a case wholly from the evidence, under the direction of the court.

For the errors mentioned, the judgment of the trial court is reversed and the cause remanded.

*Reversed and remanded.*