### Edna Curlee v. The State.

No. 9110.   Delivered Dec. 2, 1925.

Rehearing denied April 21, 1926.

#### 1.—Murder—Jury—Impanelling Of—No Error Shown.

Where, after one juror had been accepted and sworn the court permitted the defendant, at her request, to file a plea for a suspended sentence, there was no error in refusing to discharge the juror so selected, and especially in view of the conviction of murder, eliminating the issue mentioned. See Moore v. State, 85 Tex. Crim. Rep. 403, and other cases cited.

#### 2.—Same—Evidence—Hearsay—Properly Excluded.

Where, on a trial for murder, the husband of appellant having testified that he had illicit relations with deceased, and had abandoned his wife to live with her, there was no error in excluding statements made by him to the witness Nelson, of his intimacy with the deceased. Such testimony was hearsay and properly excluded.

#### 3.—Same—Continued.

The testimony of Nelson, that on one occasion he, Nelson, had accused his wife of infidelity, and made an assault on her in the presence of deceased, shed no light, was hearsay and properly excluded, as was

also the proffered testimony of Nelson and his wife that deceased admitted to them that she had spent the night at a hotel with one Dan Kivlen.

### 4.—Same—Evidence—Received and Withdrawn—No Error.

Where the court admitted testimony that deceased had been married three times, and divorced twice, and that she had been treated for a venereal disease, and afterward withdrew this testimony from the jury, no exception being reserved to this action of the court, no error is disclosed. Following Jones v. State, 38 Tex. Crim. Rep. 87, and cases cited

### 5.—Same—Evidence—Impeachment of Husband—Held Proper.

Where the husband of appellant testified in her behalf, that prior to his meeting with the deceased his relations with his wife were affectionate and happy, there was no error in permitting the state on cross-examination, to ask many questions which were germane to his direct examination, and otherwise appropriate, for the purpose of impeachment.

### 6.—Same—Evidence—Res Gestae—Properly Admitted.

Where two women, eye witnesses to the killing, followed deceased out of the store, and grabbed and held her, and appellant said, "What are you catching me for," to which Mrs. Meyer, one of the witnesses, replied, "You know what I am catching you for, you just killed a woman in the store there," to which appellant replied, "No, I have not killed anybody." This testimony was res gestae, without regard to whether appellant was under arrest at the time, or not, and was properly admitted. See Miller v. State, 18 Tex. Crim. App. 259; Wakefield v. State, 50 Tex. Crim. Rep. 124, and other cases cited. Also Underhill on Crim. Ev., 3rd Ed., Sec. 51.

### 7.—Same—Evidence—Appearance of Accused—Properly Admitted.

The testimony of the witness Rush to the effect that he saw appellant just a few moments after the killing, and she had the appearance of being cool, was properly received. Following Miller v. State, 18 Tex. Crim. App. 259, and many cases collated by Mr. Branch in his Ann. Tex. P. C., Sec. 132, p. 74.

### 8.—Same—Requested Charge—On Manslaughter—Properly Refused.

Where appellant requested a special charge to the effect that if appellant was informed that her husband had been having adulterous intercourse with the deceased, or was informed of facts which would reasonably lead to or which did create such belief, that this would constitute adequate cause.

### 9.—Same—Continued.

The refusal of this charge we think was not error. It is not believed that Art 1132 P. C. as follows: "Adultery of the person killed, with the wife of the person guilty of the homicide, provided the homicide occurs as soon as the fact of the illicit connection is discovered" makes the belief or information of the adultery of the husband, as a matter of law, adequate cause, to reduce the slaying by the wife of the husband's paramour, to manslaughter.

### 10.—Same—Continued.

Even if so however, under the facts of the present case the refusal

of the special charge is not deemed erroneous, for the reason that such information as· appellant had touching the relations of her husband with deceased were antecedent to a previous meeting of appellant and deceased, and for the further reason that the issue of manslaughter raised by the evidence was affirmatively and appropriately covered in the main charge of the court.

## ON REHEARING.

### 11.—Same—Assignments of Error—Practice on Appeal.

Under the practice and procedure in this court, assignments of error have no place. We do not consider assignments of error, and regard them only as confusing and a needless duplication. We look to bills of exception, as presenting the errors claimed, and relied upon on appeal to this court, and wish to impress this fact upon attorneys who practice before us.

### 12.—Same—Manslaughter—Requested Instructions—Properly Refused.

The rule of law relating to manslaughter based on insults to a female relative cannot be accepted as applicable to the instant case. There the insult to a female is in law made adequate cause, while in this case the injury complained of by the wife was toward herself, in the act of the deceased in having alienated the affections of her husband, and having committed adultery with him, and broken up her home. We do not think, however, that the rule applicable in cases where a man kills for insulting conduct toward a female relative should be applied, if apt.

### 13.—Same—Charge of Court—On Manslaughter—Held Correct.

All of the issues of manslaughter raised by the evidence in this case were correctly and unusually comprehensively given, and the refusal of appellant's special charges on this issue were proper. Our original opinion in passing upon the exclusion of hearsay testimony offered by appellant is found to be sound, and no error being presented which would warrant a reversal of the cause, the motion for rehearing is overruled.

Appeal from the Criminal District Court No. 2 of Dallas County. Tried below before the Hon. C. A. Pippen, Judge.

Appeal from a conviction of murder, penalty ten years in the penitentiary.

The opinion states the case.

*Robert L. Sullivan* and *Callaway, Dalton & Callaway* of Dallas, for appellant.

*Currie McCutcheon* of Dallas, *Shelby S. Cox,* Criminal District Attorney; *Sam D. Stinson,* State's Attorney, and *Nat Gentry Jr.,* Assistant State's Attorney, for the State.

MORROW, PRESIDING JUDGE.—The offense is murder, punishment fixed at confinement in the penitentiary for a period of ten years.

The deceased, Mrs. Lelia Myrtle Rine, was an employe of a store known as the LaMode. The appellant entered the store, called for Mrs. Rine, and shot her a number of times. According to a state's witness, they were about twelve feet apart. Mrs. Rine fled and appellant followed her. After shooting the deceased in the back, and after she fell, appellant fired three more shots into the body of the deceased. When the first shot was fired, the deceased had her back towards the appellant. There were a number of wounds upon the body of the deceased, several of which were fatal.

Appellant testified that she desired to see the deceased touching her relations with the husband of the appellant, and having information that the deceased was a dangerous woman, had provided herself with a pistol and went to the store where she learned where the deceased was working. According to the appellant, in response to her inquiry, deceased said that she was Mrs. Rine. Appellant then said:

"I am Mrs. Curlee.   *   *   *   I came down to talk to you about my husband and breaking up my home and taking his love from me."

Deceased replied:

"What are you going to do about it?"

Appellant testified:

"And she gave me an awful look and raised her hands this way and I dropped the sack off my gun and shot her."

Appellant further testified that she was nervous and was afraid of the deceased; that she did not know how many shots were fired; that she knew nothing of what happened until later when she was talking to an officer.

The written confession of the appellant was introduced in evidence from which we take the following quotation:

"Last Friday my husband, J. C. Curlee, left home and has not been back. We were in good humor when he left home last Friday, and on last Monday I talked to him and he said he was not coming home any more. Last Thursday he told me was going with a woman named Mable Rine and was going with her whenever he wanted to. Last Saturday I was at the court house to hear Mrs. Rine's trial, but it was postponed till Monday and on Monday was postponed till Thursday. I saw Mrs. Rine each of these times at the court house. I had heard then that she had been going with my husband, and I wanted to see her and hear the evidence. I saw her but never spoke to her. On yesterday my husband told me he was not coming home. On this morning I begged my husband to come home

and he said he was not coming home, and was going to leave town and was never going to live with me again.

"Just after this conversation with my husband, I got ready and went down to the La Mode on Elm St., where Mrs. Rine worked, carried my pistol with me in a paper sack. I went in the La Mode and asked for Mrs. Rine, and a lady came up and I asked her, 'Are you Mrs. Rine?' and she said, 'Yes.' I said, 'I am Mrs. Curlee; I came to talk to you about my husband— you have broken up my home, taken my love away from me.' Then Mrs. Rine gave me a look which went all over me and said, 'What are you going to do about it?' I then took my pistol out of the paper sack and went to shooting.

"She turned to run from me as I pulled the pistol and went to shooting. I do not know how many times I shot. She was standing up when I started shooting but was on the floor when I finished shooting. After the shooting I started away and got on sidewalk, where  *  *  *  the officer arrested me and carried me back in the store, where I gave him my name and the name of my husband. We also found the pistol there in the store where I had left it after the shooting.

(Signed)   "MRS. EDNA CURLEE."

After the announcement of ready for trial and the impanelment of one of the jurors, upon the suggestion of counsel that by inadvertence the filing of an application for a suspended sentence had been omitted, the court permitted such a plea to be filed. In refusing to discharge the juror impaneled and to permit re-examination touching the suspended sentence, there was no abuse of discretion. See Wilson v. State, 85 Texas Crim. Rep. 148; Trevinio v. State, 93 Texas Crim. Rep. 439; Muldrew v. State, 73 Texas Crim. Rep. 463. The suspended sentence law has no application to the offense of murder. The verdict finding the appellant guilty of that offense eliminated the issue mentioned. Moore v. State, 85 Texas Crim. Rep. 403; Grissom v. State, 87 Texas Crim. Rep. 465.

J. C. Curlee, husband of the appellant, testified as a witness in her behalf. His testimony is embraced in some twenty pages of the statement of facts. He testified that he became acquainted with the deceased about the 13th of July, some twenty days antecedent to the homicide; that his relations with the deceased became criminally intimate; that she was in the habit of carrying a pistol; that he had arranged with her to leave his wife and leave the state; that she had a divorce suit pending; that she made remarks intimating hostility towards the appellant; that after meeting the deceased, he refrained

from going to his home; that he frequently met the deceased at the home of Nelson; that these matters were communicated by him to his wife.

In Bill No. 6 complaint is made of the refusal of the court to receive from the witness L. C. Nelson testimony to the effect that J. C. Curlee had admitted to the witness certain facts which tended to show that Curlee and the deceased were on terms of criminal intimacy. Apparently these reputed declarations of Curlee were properly excluded under the hearsay rule. The same facts were embraced in Curlee's testimony, as appears by the record in the qualifying statement of the court in these words:

"All of this and a hundred times more, were fully detailed by J. C. Curlee to the jury, and not denied by any witness."

L. C. Nelson testified in detail to the fact that J. C. Curlee had on several occasions met the deceased at the Nelson home; that conversations over the telephone had taken place between Curlee and deceased; that Curlee and deceased had been part of an automobile party in which the witness took part; that the conduct of Curlee and deceased on the drive was suggestive of undue intimacy, and some of their conversation tended in the same direction.

It appears from Bill No. 2 that appellant sought to elicit from Nelson testimony to the effect that on one occasion he had accused his wife of infidelity and made an assault upon her; that deceased was present and was called upon to declare that the suspicions of Nelson were unfounded, but made a sneering remark to the effect that Mrs. Nelson was frequently away from her place of business. The explanation of the bill shows that this fact was not communicated by the witness Nelson to the appellant. It further shows that the same testimony was given by Mrs. Nelson, and according to her testimony, she communicated it to the appellant.

Bill No. 4 complains of the rejection of the testimony of Nelson and his wife to the effect that the deceased had admitted that she had spent the night at a hotel with one Dan Kivlen. As shown by the qualification, this reputed conversation had not been communicated to the appellant. It was purely hearsay, and we think properly rejected.

According to Bill No. 5, Mrs. McGraw would have testified that she had known the deceased for a number of years; that the deceased had been married three times and divorced twice; that deceased had been treated for venereal disease. This testimony, together with other statements tending to reflect upon the

character of the deceased, were received by the court, but that part of it about the previous marriages and the venereal disease was withdrawn. There seems to be no exception to the withdrawal. Whether the matter was remote or otherwise is not revealed by the bill. We fail to discern from the record that any error was committed in withdrawing the testimony. That action seems to have been in line with the ruling of this court in Jones v. State, 38 Texas Crim. Rep. 87; Bozeman v. State, 85 Texas Crim. Rep. 353; Spannell v. State, 83 Texas Crim. Rep. 418.

Upon the cross-examination of the husband of the appellant, various questions were propounded as a predicate for impeachment. The questions bore upon the relations of the appellant and her husband prior to his acquaintance with the deceased. At her instance, he testified upon the subject to the effect that antecedent to the time of his meeting with the deceased his relations with his wife were affectionate and happy. This rendered their previous relations the proper subject of impeachment, and the matters are deemed appropriate to that end. The bill, as qualified, is to that effect. Bill No. 8 is upon the same subject with like qualifying remarks of the court. In neither of these bills do we find aught which would warrant the conclusion that the questions propounded were not germane to the direct examination, nor that they were otherwise inappropriate to the purpose of impeachment. The bills, especially as qualified, fail to disclose error.

Two eye-witnesses described the firing of the shots, and as the appellant was leaving the store, one said to the other: "We can't afford to let that woman get away like that." The other replied: "No, we can't; come on, let's catch her." They ran after the appellant and caught her near the door of the store. Mrs. Meyer caught her around the waist. Appellant said: "What are you catching me for?" Mrs. Meyer replied: "You know what I am catching you for; you just killed a woman in the store there." Appellant replied: "No, I have not killed anybody." The remarks of Mrs. Meyer to the appellant and her reply were part of the res gestae. They were admissible even though it be assumed that the conduct of Mrs. Meyer and Miller constituted an arrest. The remarks of Mrs. Meyer and Miller, which are mentioned above, if not admissible, were, in the light of the uncontroverted evidence, not ground for reversal. The testimony of the witness Rush that the appellant had the appearance of being cool a few moments after the shooting was not improperly received. See Miller v. State,

18 Texas Crim. App. 259, and many cases collated by Mr. Branch in his Ann. Tex. P. C., Sec. 132, p. 74.

The declaration imputed to the appellant, viz., "No, I have not killed anybody," was not improperly received. It was admissible under the res gestae rule. On the subject, we quote from a text writer as follows:

"The declarations and statements of the accused uttered immediately after the homicide and connected with it are often received as a part of the res gestae, and they may be received in his favor. Thus, he may prove that after the homicide he said that he had shot the deceased, and that he wanted somebody to go to him as quickly as possible, that he would be glad if a doctor could be procured, and that he was going for a doctor himself. The accused may also prove that he stated to a physician, who was dressing his wound, how he received the wound and that it was inflicted on him by the deceased. The accused may show that, within a minute or two after the shooting, he stated to a third person that he had shot the deceased in self-defense. The declarations of the accused when he was arrested are admissible; though where he surrendered himself to an officer some time after the commission of the homicide, he cannot prove what he said at the time. The statements of the accused made immediately after the crime are usually received if they are admissions or confessions." (Underhill's Crim. Ev., 3rd Ed., Sec. 511.)

See also Wakefield v. State, 50 Texas Crim. Rep. 124; Darter v. State, 39 Texas Crim. Rep. 40; Cotton v. State, 86 Texas Crim. Rep. 387.

The declaration in question, moreover, was not of a harmful nature as it is quite consistent with the testimony of the appellant to the effect that she knew nothing of what took place for some time after the shots were fired.

In the court's charge on the subject of manslaughter, the characteristics of the law of adequate cause were explained to the jury in terms of approved charges upon the subject, including an instruction directing the minds of the jury to the fact that they were privileged to take into account not only the words and acts of the deceased at the time, but other facts and circumstances revealed by the evidence. Upon the subject, the charge contains these further instructions:

"It is your duty in determining the adequacy of the provocation, if any, to consider in connection therewith, all the facts and circumstances in evidence in the case, and if you find that by reason of anything that deceased did or said, if anything,

that the defendant's mind at the time of the killing was incapable of cool reflection, and that said facts and circumstances, if any, were sufficient to produce such state of mind in a person of ordinary temper, then the proof as to the sufficiency of the provocation satisfies the requirements of the law, and so in this case, you will consider all the facts and circumstances in evidence in determining the condition of the defendant's mind at the time of the alleged killing, and the adequacy of the cause, if any, producing such condition.

"Further, upon the question of manslaughter, I instruct you that if you find and believe from the evidence, that on or about the 13th day of July, 1924, the husband of the defendant began to keep company and associate with the deceased, and that his going with her was communicated to this defendant, and that the defendant's husband began to remain away from home and to refuse, at the defendant's request, to spend his nights with her; and that the defendant remonstrated with her husband for his association with the deceased, if any he had, and his remaining away from home, and that the defendant believed what had been communicated to her by her husband and by others, that her husband was guilty of improper association with the deceased, and that the husband of the defendant was mistreating his wife with reference to their marital relations; and,

"If you further believe from the evidence that any or all of those things and matters had been communicated to the defendant, which she believed, whether they were true or untrue, and were sufficient to create in the mind of a person of ordinary temper that degree of anger, rage and resentment which would render the mind incapable of cool reflection," etc.

These instructions were deemed adequate to preserve and protect the rights of the appellant and to properly inform the jury upon the law of manslaughter as arising from the evidence adduced upon the trial. The appellant requested a special charge to the effect that if the appellant was informed that her husband had been having adulterous intercourse with the deceased or was informed of facts which would reasonably lead to or which did create such belief, that this would constitute adequate cause. In refusing this charge, we think no error was committed. It is not believed that Art. 1132, P. C., as follows:

"Adultery of the person killed with the wife of the person guilty of the homicide; provided, the killing occurs as soon as the fact of an illicit connection is discovered,"

makes the belief or information of the adultery of the husband as a matter of law adequate cause to reduce the slaying by the wife of the husband's paramour to manslaughter. Even if so, however, under the facts of the present case, the refusal of the special charge is not deemed erroneous, for the reason that such information as appellant had touching the relations of her husband with deceased were antecedent to a previous meeting of appellant and deceased.

Many statements contradictory of the witness, J. C. Curlee, the husband of the appellant and principal witness to the misdeeds of the deceased, were adduced. It was shown that he had admitted an estrangement between himself and his wife antedating the homicide some two years; that their association as husband and wife had been only occasional since that time; that he had had no improper relations with the deceased.

To combat the theory advanced by the appellant in her testimony that before she was shot the deceased made a demonstration with her hands, the state introduced, in rebuttal, eye-witnesses to the effect that deceased had nothing in her hands and that no demonstration by her was seen by the witnesses.

In her dying declaration deceased said:

"I have done no wrong. I have been double-crossed by the Nelsons. I am ready to meet my mother and my Savior."

There was also evidence that the appellant, prior to the homicide, had expressed her intention to kill the deceased.

Our examination of the record leads us to the conclusion that no error was committed upon the trial of the appellant which warrants the disturbance of the verdict, and the duty of this court is to order an affirmance of the judgment, which is accordingly done.

*Affirmed.*

### ON MOTION FOR REHEARING.

LATTIMORE, JUDGE.—Appellant predicates her motion upon supposed errors in regard to matters set up in various "assignments of error." This court has frequently attempted to impress upon attorneys practicing before it that it does not consider assignments of error and regards them only as confusing and a needless duplication. We look to bills of exceptions as presenting the errors claimed and relied upon on appeal to this court. If we rightly understand appellant's complaint in this motion, it is, first, of our holding in regard to the rejection of certain evidence deemed pertinent as tending to show that she was only guilty of manslaughter. Complaint

is also presented of our ruling on her exception to the charge on manslaughter, and our holding with regard to certain matters offered as res gestae.

The ordinary rule relating to manslaughter based on insults to a female relative could not be deemed exactly applicable here, inasmuch as a woman killed another woman and sought to show that the dead woman had tried to win her husband, break up her home, etc., and that information and facts tending to establish such conclusion so inflamed her mind as to render it incapable of cool reflection. We do think, however, that the rule applicable in cases where a man kills for insulting conduct toward a female relative should be applied if apt. In this case the accused wanted to prove by one Nelson his acts of criminal intimacy with deceased and a course of conduct between him and deceased wholly separate and apart from appellant and of which she had no knowledge, as is stated by the court's qualification to the bill of exceptions. To us it seems that the rejection of this testimony on the part of the trial court was entirely proper.

The only rejected testimony of Mrs. Nelson appearing in any bill of exceptions was as to statements made to her by deceased admitting her criminal intimacy with one Dan Kivlen. As said in our original opinion, this was purely hearsay and a matter of which appellant had no knowledge when she shot deceased. The rejected testimony of Mrs. McGraw was as to a conversation had with another woman, appellant being present, on Saturday before this killing on Wednesday following. It is stated in the bill that the other woman said in that conversation that deceased induced Mr. Rine to separate from a former wife and to marry her; also that Mrs. Rine had a venereal disease. It is fully shown by the testimony in this case that on Monday following the conversation referred to, there was a meeting between appellant and deceased at the court house in Dallas County, and if we give effect to the law relating to such meeting in other manslaughter cases, appellant not then manifesting a mind inflamed by passion, she would not be in position to assert injury because of the rejection of testimony as to what was said in the Saturday conversation, even if it could have had the effect to influence her mind when she heard it, and we still think it correctly rejected.

The court's charge on manslaughter was unusually comprehensive, and we are not in accord with appellant's complaint directed at that part of it wherein the court told the jury with reference to appellant's rights if her mind was inflamed by

what was said or done by the deceased at or immediately preceding the time of the killing. The court in other parts of the charge fully instructed the jury as to the law of all defensive issues upon which manslaughter could be predicated, and told the jury specifically to consider all the facts and circumstances in evidence, and gave the jury the charge quoted in our original opinion, deemed by the learned trial judge applicable to the peculiar facts in the instant case.

What was said to and by appellant when parties pursued her at once after the shooting seems so plainly res gestae as not to call for extended discussion. The shot had just been fired by appellant, who went immediately away, but was overtaken when fifty or seventy-five feet from the scene, and the conversation there took place. She was brought back to the store where the shooting occurred and her appearance at that time was testified to as being that of a person who was very cool. We are unable to conclude that our decision of any of these matters in the original opinion was erroneous.

So believing, appellant's motion for rehearing will be overruled.

*Overruled.*